IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 29, 2014

## STATE OF TENNESSEE v. KAYLN MARIE POLOCHAK

**Appeal from the Criminal Court for Overton County**
**No. 2011-CR-45   David A. Patterson, Judge**

**No. M2013-02712-CCA-R3-CD - Filed January 16, 2015**

The Defendant, Kayln Marie Polochak, was convicted by an Overton County Criminal Court jury of first degree premeditated murder, first degree felony murder, conspiracy to commit first degree murder, a Class A felony, especially aggravated robbery, a Class A felony, and theft, a Class D felony. *See* T.C.A. §§ 39-13-202, 39-13-103, 39-13-403, 39-14-103 (2014). The trial court merged the first degree and felony murder convictions and imposed a life sentence. The court also imposed concurrent sentences of fifteen years at 30% service for conspiracy to commit first degree murder, fifteen years at 100% service for especially aggravated robbery, and two years at 30% service for theft. On appeal, she contends that (1) the evidence is insufficient to support her convictions, (2) the trial court erred by denying her motion for a judgment of acquittal, (3) the trial court erred by denying her motion to suppress her pretrial statements, (4) the trial court erred by refusing to exclude the video recording of the crime scene depicting the victim's body at the scene and a photograph taken during the victim's autopsy, (5) the trial court erred by excluding evidence of the victim's fear of the codefendant, (6) the trial court erred by excluding witness testimony related to the Defendant's mother's consenting to police questioning of the Defendant, (7) the trial court erred by failing to provide an intoxication jury instruction, (8) the trial court erred by failing to provide a duress jury instruction, (9) the mandatory life imprisonment sentence violates the federal and Tennessee constitutional prohibitions against cruel and unusual punishment, and (10) the juvenile court erred by transferring her case to the criminal court. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROGER A. PAGE, JJ., joined.

Michael Savage, Livingston, Tennessee, for the appellant, Kayln Marie Polochak.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Randall York, District Attorney General; and Mark E. Gore, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the strangulation death of seventy-two-year-old Hassie Pearl Breeding on December 10, 2010. At the trial, Teresa Breeding, the victim's daughter, testified that she unsuccessfully attempted to telephone the victim on December 11. Her nephew, Brandon, told her that he and his girlfriend were going to stop by the victim's house for a visit. She told Brandon that she had been unable to reach the victim all day and asked him to text Benjamin Bowers, also her nephew and the codefendant in this case, inquiring about the victim's whereabouts. She explained that the Defendant was Mr. Bowers's girlfriend and that the Defendant and Mr. Bowers had been living with the victim. She met the Defendant at Thanksgiving dinner the previous month.

Ms. Breeding testified that at 10:00 p.m. on December 11, 2010, she and her eight-year-old daughter drove to the victim's house. Her daughter remained in the car while Ms. Breeding entered the house. She noticed the lights were off, and the victim's 2006 silver Toyota Scion was gone. She said that when she entered one of the bedrooms, she saw a cover over something on the floor. When she removed the cover, she saw a pillow over the victim's face. She said the victim was cold and her skin was discolored. At the time she found the victim, Ms. Breeding was on the telephone with her niece, Jennifer Bolo. They each called 9-1-1. While Ms. Breeding was on the telephone with 9-1-1, she saw a cord around the victim's neck.

Ms. Breeding identified a diagram of the victim's house and explained the layout. She identified a photograph of the victim lying on the bedroom floor and identified the pillow she removed from the victim's face. She identified photographs of the victim's car. She last saw the victim two or three days previously.

On cross-examination, Ms. Breeding testified that she was on the telephone with Ms. Bolo when she pulled into the driveway and noticed the lights were off and the victim's car was gone and that she asked her niece to stay on the telephone with her. She denied being afraid. She did not recall finding broken glass near the victim. She agreed she looked in Mr. Bowers's room and saw many holes in the walls. Although she never saw Mr. Bowers create the holes, to her knowledge, Mr. Bowers was responsible for them.

Ms. Breeding testified that the victim pinned money to the inside of her sock. She said she was looking for Mr. Bowers when she first entered the house because she wanted to ask him if he knew the victim's whereabouts. She spoke to the victim several times per week.

Billy Breeding, the victim's son, testified that he was a lienholder on the victim's car and that its value at the time of the victim's death was about $8000. On cross-examination, Mr. Breeding testified that he saw the victim as often as possible and that he interacted with Mr. Bowers very little. He denied knowing Mr. Bowers had a reputation for violence. He recalled, though, an incident when Mr. Bowers was a teenager during which Mr. Bowers shoved the victim. The police were called to the scene and talked to Mr. Bowers, but Mr. Breeding heard nothing else about the incident. Mr. Breeding talked to the victim about the incident.

Mr. Breeding testified that he knew holes existed in the walls of Mr. Bowers's bedroom but denied knowing who caused them. He did not recall telling a deputy investigating the victim's death that Mr. Bowers had a bad temper and was known for breaking things when he was angry.

Patricia Bilbrey, the victim's daughter, testified that she learned about the victim's death from her niece. She identified Mr. Bowers as her nephew and said he lived with the victim. She said the Defendant was Mr. Bowers's girlfriend, who also lived at the victim's house. She said Mr. Bowers was about twenty or twenty-one years old at the time of the victim's death. She said the victim was about 5'4", weighed about ninety-eight pounds, and was in poor health with "crippling arthritis," a bad knee, and heart problems.

On cross-examination, Ms. Bilbrey testified that the victim had placed her money in her sock to prevent anyone from knowing where she kept it. She agreed Mr. Bowers had previously taken some of the victim's medication. She said the victim generally dreaded going home because the Defendant and Mr. Bowers left dirty dishes in the kitchen and clothes on the floor and because the Defendant yelled at the victim. She denied that the victim claimed Mr. Bowers was violent toward the victim. She admitted, though, the victim claimed Mr. Bowers had pushed the victim. She denied seeing Mr. Bowers act violently or yell at anyone. She was not surprised Mr. Bowers and the Defendant were suspects in the victim's death. She acknowledged she had not told the police that she was not surprised at the Defendant's involvement.

Overton County Sheriff's Deputy Tim Porter testified that he responded to the scene and that he found the victim lying on the floor with a cover over her legs and a red cord around her neck. A pillow was just above her head. She did not have a pulse, and paramedics declared her deceased.

On cross-examination, Deputy Porter testified that Deputy Steve Flowers began the crime scene log. He said a dog was on the back porch and did not know if the dog had been inside the house after the killing. He did not recall seeing a cat. He said the two paramedics were escorted inside the house to the victim's location, and two others came to the bedroom in which the victim was found. He denied those who entered the house wore protective coverings on their shoes. He did not recall Fire Chief Rocky Dial being at the scene. On redirect examination, he denied seeing Chief Dial inside the victim's house.

Tennessee Bureau of Investigation (TBI) Special Agent Steve Huntley testified that he arrived at the scene around 12:35 a.m. He said that Mr. Bowers and the Defendant were considered suspects early in the investigation and noted that they were missing, along with the victim's car. He entered the house after a search warrant was obtained, and the outside of the house was photographed and video recorded.

A recording of the crime scene was played for the jury while Agent Huntley narrated. The recording showed no broken windows or doors and no signs of forced entry. A cat was seen walking around inside the house. Agent Huntley noted that the victim was found inside Mr. Bowers and the Defendant's bedroom and that the victim was still wearing her jewelry. A red "dog cord" was found around the victim's neck. He noted the recording showed holes in the bedroom door and walls. Items were marked with evidence placards, including two hats, a black t-shirt, and a red-brownish spot on the floor. Inside the Defendant and Mr. Bowers's bedroom, evidence placards identified the dog cord and wire cutters. In the entryway to the adjoining bathroom, a black ski mask with the eyes cut out and two black gloves were found. A lens from a pair of eyeglasses was found, and the respective broken eyeglasses were found in the bedroom with the victim. The blanket and the pillow that covered the victim were also identified. Outside the victim's house, a Chevy Blazer was parked in the driveway, and Agent Huntley noted the passenger-side window was broken and a screwdriver was lying nearby on the ground. Inside the Blazer, the victim's TennCare card was found.

Agent Huntley testified that the dog cord found around the victim's neck, the pillow and pillowcase, and the wire cutters were submitted to the TBI Crime Laboratory for analysis. He identified photographs of the victim after the blanket was removed, which showed a $20 bill protruding from the victim's left sock. He learned during the course of his investigation that the victim kept money in the socks she wore.

-4-

Agent Huntley testified that he and TBI agents traveled to Indiana where Mr. Bowers and the Defendant were found. The Defendant and Mr. Bowers had the victim's car, which Agent Huntley searched upon arriving in Indiana. The victim's utility bill was found inside the car. Also inside the car was a black purse containing keys, a pink cell phone, and a gold watch. In the front passenger seat, he found a handwritten note signed by the Defendant. The letter stated,

> Ben is the only person who has . . . ever had my heart like this[.] I love him so much. If you have found this you obviously know what has happened. I want his last name on my grave & I want to be cremated w[ith] him. Kim Coffel would be my mother. She made me go this way. She's ignored all my signs for years. She isn't a mom & will never be one now.

The letter identified a telephone number for the reader to call and said Natalie "should know I love her & everyone else." The Defendant wrote she loved "Benjamin to[o] much. P/z d[o]n't break us apart." Agent Huntley stated that a black backpack was also found inside the victim's car.

Agent Huntley testified that the victim's car was taken to the local police department, and Mr. Breeding returned the car to Tennessee. Agent Huntley searched the car again after it was returned to Tennessee and found a Food Lion receipt dated December 10, 2010, at 9:13 p.m. and two toboggans. He said the toboggans were seen inside the car when it was searched in Indiana. He did not realize they were connected to the Defendant and Mr. Bowers until he saw video footage of them wearing the toboggans in Overton County. He said, "[T]ake right, go through Glasgow, take 65" was written on the back of the receipt.

Agent Huntley testified that he obtained video recordings from various places in Overton County, including a convenience store and Food Lion. He obtained warrants for the Defendant's and Mr. Bowers's DNA, and the samples were submitted to the crime laboratory for analysis. He said the black gloves and ski mask found inside the victim's house were also submitted to the crime laboratory for analysis. He identified a photograph of a Kentucky Fried Chicken box found on the kitchen counter inside the victim's house and said the purchase receipt was dated December 10, 2010, at 5:07 p.m.

On cross-examination, Agent Huntley testified that he reviewed the log identifying who was allowed to enter the crime scene. He agreed several emergency workers were allowed inside the house after the victim was declared dead, and no legitimate reason existed for their entry. He also agreed the log did "not document[]" each time someone left the crime scene area. He did not know if everyone inside the crime scene wore gloves and protective coverings over their shoes.

Agent Huntley testified that the medical examiner gave him the victim's clothes and jewelry. Regarding the reddish-brown spot on the floor of the victim's house, he agreed that the property inventory stated that it was blood, that the substance was not analyzed, and that he did not know what it was. Regarding the red substance found on a door, he said the substance was not analyzed. Although he did not know the cause of death, he said the victim was clearly strangled.

Agent Huntley testified that his theory of the case was Mr. Bowers placed his foot on the victim's back and pulled the dog cord tight around the victim's neck. He said the Defendant's and Mr. Bowers's statements supported the theory. Wire cutters were collected from the Defendant and Mr. Bowers's bedroom and analyzed to determine if the cutters were used to cut the dog cord. He noted one piece of the dog cord was found around the victim's neck and another piece was found inside the Defendant and Mr. Bowers's bedroom. He agreed no evidence showed the Defendant touched the wire cutters, however, Mr. Bowers admitted to using the wire cutters to cut the dog cord.

Agent Huntley testified that he found a broken eyeglass lens on the floor near the victim and that the frames were lying on a pile of clothes in the same room. He did not know how the frames came to be on the pile of clothes. No fingerprints were found on the frames, and the frames were not analyzed for the presence of DNA or fibers. He agreed he did not obtain the Defendant's fingerprints, although he obtained Mr. Bowers's fingerprints. He denied the blanket found covering the victim was analyzed but said the pillow found on the victim's face showed the presence of the Defendant's and Mr. Bowers's DNA profiles. He said he did not know if the Defendant's living in the victim's house might explain the presence of her DNA on the pillow. He agreed the crime laboratory and the medical examiner were told the police suspected the victim was strangled and smothered. He considered the dog cord and the pillow as "instruments of death."

Agent Huntley testified that the Defendant was a suspect even before she gave her confession. He learned during the investigation that the Defendant was in the bedroom when Mr. Bowers began choking the victim with the dog cord. He said the Defendant came out of the bedroom, placed a pillow over the victim's face, and smothered the victim. The Defendant stated that she was not asleep when Mr. Bowers began strangling the victim.

Agent Huntley testified that he believed the scene was staged to look like a "bad burglary" based on the ski mask and gloves found inside the house and the broken car window and screwdriver found outside the house. He denied the screwdriver was analyzed because Mr. Bowers admitted to breaking the car window with the screwdriver and agreed no evidence suggested the Defendant was involved with breaking the window. He did not see signs of a struggle inside the house and did not recall any abrasions to the victim's body.

The victim's clothes were not analyzed because the police knew who killed the victim based on the investigation, the Defendant's and Mr. Bowers's confessions, and the presence of their DNA on the pillow. He noted that the Defendant and Mr. Bowers fled to Indiana in the victim's car and that the Defendant told two paramedics that she and Mr. Bowers killed the victim.

Agent Huntley testified that scrapings from under the victim's fingernails were analyzed for DNA but that none was found. He noted the victim was a frail, elderly woman who, according to the Defendant, could not fight back. Mr. Bowers was 5'9" to 5'10" tall and weighed about 160 pounds.

Agent Huntley testified that the video recording of the scene showed that a cat was inside the victim's house. He placed the cat in the master bathroom after he arrived. He did not know if the gloves found inside the house were for a man, but after examining them, he said they appeared to be for a "small" person. He could not identify an object on the victim's forefinger, but he said the object did not appear to be a fiber. He said the object could have been on the victim all day. He did not know if the ring on her forefinger was backward. He agreed that if the victim's ring was backward, it could have become "turned around" during a struggle or when her body was dragged. He denied having the victim's ring analyzed for DNA.

Agent Huntley testified that two of the holes in the door were created when Mr. Bowers became angry due to the Defendant's mother's threatening to report Mr. Bowers and the Defendant to the police. He identified holes in the wall of the Defendant and Mr. Bowers's bedroom. He said Mr. Bowers possessed the wire cutters before the victim came home.

Agent Huntley testified that the crime scene log failed to show when Detective Steve Hritz left the scene. He said, though, the log correctly reflected who entered the scene. He agreed his request to the crime laboratory stated that the Defendant and Mr. Bowers choked the victim with a dog cord and used a pillow to prevent her from breathing.

On redirect examination, Agent Huntley testified that he provided the statement of facts for the crime laboratory request after investigating the scene, collecting evidence from the medical examiner, and interviewing the Defendant and Mr. Bowers. He said Detective Hritz assisted him at the scene.

Agent Huntley testified that he attempted to corroborate the Defendant's confession with the physical evidence from the scene and Mr. Bowers's confession. The Defendant's confession was consistent with the evidence found at the scene, and Agent Huntley said the

Defendant's and Mr. Bowers's confessions "pretty much matched." He agreed the Defendant's statement that she and Mr. Bowers attempted suicide corroborated her statement to the police that they wanted to go out with a bang.

Agent Huntley read to the jury the written statement Mr. Bowers provided to the police. In the statement, Mr. Bowers stated that his grandmother allowed him and the Defendant to live with her and that the victim treated them well. They used the bedroom across from the bathroom, which had the holes in the walls. He admitted stealing from the victim previously and knew the victim kept her money in a black pouch tucked in her sock. Mr. Bowers's only concerns in life, though, were his drug addiction and the Defendant.

On the day of the killing, Mr. Bowers said he and the Defendant stayed home, and they talked about how they "could be together." He said, "We figured we would kill my Grandmother and take her money." They packed their belongings before the victim arrived home, and he said the Defendant thought of choking the victim with a dog leash. He said the plan was for Mr. Bowers to approach the victim from behind and place the leash around her neck. He said he practiced on the Defendant to determine how best to do it. He cut the leash with the wire cutters and left them in their bedroom. He stated, "I guess . . . me and [the Defendant] planned this out even premeditated what we did." When the victim arrived home at 5:30 p.m., Mr. Bowers approached her from behind, placed the leash around her neck, and choked her. He said he wore the black gloves during the attack. He yelled for the Defendant's assistance. The Defendant came from their bedroom with a pillow and placed it over the victim's face. The victim fell to the floor as Mr. Bowers applied pressure. As he pulled the leash as tight as possible, the Defendant held the pillow over the victim's face. The victim attempted to fight, and Mr. Bowers heard "a little sigh and gurgle." The Defendant laid her entire body on the victim and applied pressure on the pillow. After the victim was dead, Mr. Bowers took money from the victim's purse. He removed $420 from the victim's right sock. Mr. Bowers and the Defendant placed their belongings in the victim's car and left. Mr. Bowers and the Defendant bought gas, drove to Sparta to buy $200 worth of drugs, and drove to Indiana.

Mr. Bowers noted the Defendant spoke with her mother earlier that day. The Defendant's mother threatened to call the police "to get Kalyn home." Mr. Bowers threw the wire cutters into the bedroom door. He admitted breaking the window in the Blazer when he attempted to remove the window to unlock the door and take the battery. He wanted to put the battery in his car, which would not start. He concluded his statement by saying "this was the only way me and Kalyn could think of being together." He claimed he would have done anything for the Defendant.

Agent Huntley testified that he considered the Defendant's and Mr. Bowers's statements to be consistent. He said the statements each referenced the same date and time of the killing, Mr. Bowers's placing the dog cord around the victim's neck, the Defendant's placing a pillow over the victim's face, and the motive for obtaining money and a car to get out of town. He said each statement also claimed that the killing occurred because the Defendant's mother threatened to report Mr. Bowers to the police. He agreed the evidence he submitted for analysis to the crime laboratory was based, in part, on the two confessions. On recross-examination, he stated that the Defendant admitted to attempting suicide three times within the twenty-four-hour period before her arrest.

TBI Special Agent Darrin Shockey testified that he assisted in the collection of evidence. He previously worked as a latent fingerprint examiner at the crime laboratory and said he and Agent Huntley discussed which items, if any, at the scene should have been examined for fingerprints. Agent Huntley asked his opinion regarding which items should have been analyzed. Agent Shockey said none of the items needed analysis, and his conclusion was based on the fact that the people involved in the killing most likely lived in the victim's house.

On cross-examination, Agent Shockey testified that he was not surprised that the eyeglasses were not analyzed for fingerprints. He agreed the agent in charge decided which items to analyze.

Overton County Sheriff's Detective Steve Hritz testified that emergency personnel and four deputies were at the scene when he arrived. He marked the evidence at the scene with placards and assisted in the collection of evidence. He said that on January 19, 2011, he and Agent Huntley searched the victim's car and collected the Food Lion receipt. He also assisted in the collection of surveillance videos from the Raceway Market in Livingston. On cross-examination, he stated that about ten people were inside the victim's house when he arrived and that many of them were in the bedroom where the victim was found.

Raceway Market Store Manager Ashley Ogletree testified that on December 10, 2010, she worked from 2:00 p.m. to 12:00 a.m. Although she did not know Mr. Bowers personally, she knew who he was and recognized him when he entered the store on December 10. Although she said Mr. Bowers was with a woman, she could not identify the woman in the courtroom. She said later, though, that she identified the Defendant as the woman at the juvenile court transfer hearing. She said Mr. Bowers entered the restroom, and the woman asked a few customers for directions to Indiana, asked to look at a map, and wrote down directions. The woman mentioned she was pregnant and was going to name her son Maverick.

Ms. Ogletree testified that the police obtained a video recording from the store, which was played for the jury. Ms. Ogletree narrated as the recording was played. She identified the Defendant, who reached for a map. The Defendant wore a pink and black toboggan. The Defendant realized she was looking at the wrong map and grabbed the correct map. Ms. Ogletree gave the Defendant paper and pen to write directions. Ms. Ogletree's son was behind the counter, and the Defendant mentioned she was pregnant. The Defendant acted "just normal" and was happy she was traveling to Indiana to visit relatives. Mr. Bowers walked into the store wearing a black toboggan. The Defendant and Mr. Bowers discussed paying for gas and whether Mr. Bowers wanted food or drink. Mr. Bowers left to pump gas, and the Defendant paid for it and left. Ms. Ogletree saw them leaving in a "silver hatchback."

Livingston Food Lion Store Manager Nathaniel Kennard testified that he was responsible for maintaining the store surveillance system. He described the locations of the cameras and said he retrieved the recording from December 10, 2010, which was played for the jury. Mr. Kennard stated that the recording was time stamped at 9:05 p.m. and showed a person leaving the store. He said the recording also showed a couple checking out at register three at 9:12 p.m. Mr Kennard maintained an electronic journal of customer transactions and identified a $25.26 entry from the 9:12 p.m. transaction. He identified the Food Lion receipt previously entered into evidence and said it corresponded to the journal entry.

Rebecca Kinder testified that she was a paramedic in Grant County, Indiana and that she was working with fellow paramedics Yolande Bailey and Justin Black on December 12, 2012. She, Ms. Bailey, and Mr. Black responded to a possible drug overdose call at the Gas City Police Department. She learned that the Defendant "shot up . . . nicotine water in a syringe." She examined the Defendant, and Ms. Bailey and Mr. Black examined Mr. Bowers. Ms. Kinder said the Defendant was upset and was wearing soaking wet clothes. The Defendant's vital signs were normal. She asked about the Defendant's clothes, and the Defendant told her that she had been in the bathtub at her grandparents' house with her boyfriend and that the "stuff on TV you see doesn't work." When Ms. Kinder asked the Defendant what she meant, the Defendant said "we" put electronic devices in the bathtub attempting to electrocute "ourselves."

Ms. Kinder testified that the Defendant claimed she felt nauseous and might have been pregnant. She said one of the officers asked the Defendant for her mother's contact information, but the Defendant refused and claimed her mother was a drunk who did not care about her. Ms. Kinder convinced the Defendant to provide the contact information, and she began to talk about the killing. The Defendant stated that she lived at her boyfriend's grandmother's house with her mother's consent but that her mother was going to force her

to return home because her mother stopped receiving "finances of some type." The Defendant claimed her mother threatened to have her boyfriend arrested for statutory rape if the Defendant did not return home.

Ms. Kinder testified that the Defendant continued to cry and stated, "[I]t's never going to be okay, I shouldn't have done it, I shouldn't have hurt her, I just wish I hadn't done it." Ms. Kinder asked if someone needed medical assistance, and the Defendant said nobody could help because "she" was in Tennessee. The Defendant said, "[Y]ou can't help her, we killed her, oh my God, I wish I hadn't done that, oh my God, I wish I hadn't done that." The Defendant told Ms. Kinder that her boyfriend "got behind her, took a dog leash and strangled her and I put a pillow on her face and smothered her, oh my God, oh my God, I just wish I hadn't done it."

Ms. Kinder testified that although the Defendant was upset, her vital signs were normal, and Ms. Kinder found no medical problems to warrant treatment. The Defendant complained of an upset stomach, lay on the floor, and slept.

On cross-examination, Ms. Kinder testified that Mr. Bowers was in an adjacent room while she talked to the Defendant and that Mr. Bowers stared at the two of them while they talked. She agreed Mr. Bowers watched them closely. She also agreed the Defendant admitted to using drugs and to attempting suicide because "they . . . wanted to be together forever." She said the Defendant looked liked she had not slept.

Ms. Kinder testified that the Defendant definitely said "we" killed the victim, not "he" killed her. She was positive the Defendant said she put the pillow on the victim's face and smothered the victim.

Yolande Bailey testified that on December 12, 2010, she worked as a part-time paramedic in Grant County, Indiana. She received an attempted suicide call and responded to the police department with Ms. Kinder and Mr. Black. She said the Defendant and Mr. Bowers were examined but not transported to the hospital. She said the Defendant did not receive medical treatment. She heard the Defendant tell Ms. Kinder about attempting suicide and killing Mr. Bowers's grandmother in Tennessee. The Defendant said Mr. Bowers "got behind the grandmother . . . with a leash and then [the Defendant] got on top of her with a pillow." The Defendant said they killed the grandmother for money. On cross-examination, Ms. Bailey stated that the Defendant's clothes were soaking wet.

Indiana State Police (ISP) Sergeant Matthew Collins testified that on December 12, 2010, he was asked to help locate the Defendant and Mr. Bowers, who were wanted for questioning relative to a homicide in Overton County, Tennessee. He was provided

-11-

information about the victim's vehicle because it was believed the Defendant and Mr. Bowers were traveling in the car. Overton County Sheriff's Deputy John Mackie asked him to investigate a house owned by Charles and Helen Vaunce,[1] the Defendant's grandparents. He said the victim's car was found at the Vaunce's house. He said that Gas City Police took the Defendant and Mr. Bowers into custody and that they were at the police station when he arrived. He was advised that the Defendant stated she was involved in the murder of Mr. Bowers's grandmother. Sergeant Collins drove to the Vaunce home to examine the victim's car, which was secured and towed to the Fort Wayne ISP Post. He spoke to Mrs. Vaunce and returned to the Gas City Police Department to interview the Defendant.

Sergeant Collins testified that he read the Defendant her *Miranda* rights, that the Defendant read the form herself, that the Defendant said she understood her rights, and that she did not have any questions. The Defendant signed the waiver of rights form and provided a statement.

The Defendant's recorded statement was played for the jury. When asked for identifying information, the Defendant said she had "been [giving] it all day long." She asked if her mother knew what was happening. Sergeant Collins told the Defendant that her mother had been told it was important for the authorities to speak to the Defendant. The Defendant had been living with Mr. Bowers at his grandmother's house. On December 10, 2010, her mother called and was upset after receiving a notification she would not receive food stamp benefits if the Defendant did not live with her. The Defendant's mother said that she would have Mr. Bowers arrested for statutory rape and that the Defendant would be in trouble with the authorities. The Defendant might have been pregnant. After the call, the Defendant and Mr. Bowers got high by injecting Dilaudid. They discussed going "out with a bang." Mr. Bowers mentioned killing his grandmother. The Defendant did not want to see blood and recommended they use a dog leash as a weapon. When the victim came home from work, Mr. Bowers choked her with the leash, and the Defendant pushed a pillow on the victim's face. The victim made unusual noises and died after about two minutes. They dragged the victim's body into a bedroom and covered it with bed linens and a pillow. Mr. Bowers took $200 from the victim's body, and they took the victim's car to Indiana to visit the Defendant's relatives. The Defendant said she was sorry she had damaged the lives of Mr. Bowers, herself, and her unborn child. On the day she was taken into custody, she had tried to commit suicide three times. She and Mr. Bowers sat in a bathtub and put appliances in the water. They also tried to kill themselves in a car through carbon monoxide inhalation and by injecting nicotine water. She wished she were dead. Near the end of the interview, she asked if she could still have a lawyer.

---

[1] The record reflects that the witness referred to the Defendant's grandparents as Vaunce and that the prosecutor referred to Faunce. We use Vaunce for consistency.

On cross-examination, Sergeant Collins testified that the Defendant was taken into custody around 11:20 a.m. and that he did not recall if her clothes were wet. His interview of the Defendant began at 7:13 p.m. He did not know if the Defendant had eaten, had anything to drink, or used the restroom between her arrest and the interview. The Defendant did not appear sleepy or disoriented, and Sergeant Collins did not recall if she wore handcuffs during the interview. He agreed he thought it was important to talk to her when he did because she was a person of interest in a homicide.

TBI Special Agent Chuck Hardy, an expert in DNA analysis, testified that he analyzed various items found at the crime scene for the presence of DNA, including the ski mask, a pair of gloves, the pillow and pillowcase, the dog cord found around the victim's neck, and nail clippings from the victim. He was provided samples of the victim's blood and the Defendant's and Mr. Bowers's DNA. Relative to the right glove, Agent Hardy found the presence of the Defendant's and Mr. Bowers's DNA. He said the probability of randomly selecting an unrelated individual who would have been a contributor to the DNA found on the glove was approximately one in 1.9 million for the African-American population, one in 38.5 million for the Caucasian population, one in 78.2 million for the Southeastern Hispanic population, and one in 40.6 million for the Southwestern Hispanic population. He concluded that the victim's DNA was not on the glove.

Agent Hardy testified that he found the presence of Mr. Bowers's and the Defendant's DNA on the ski mask. Regarding the Defendant's DNA, he concluded that the probability of an unrelated individual having the same DNA profile was approximately one in 946 for the African-American population, one in 231 for the Caucasian population, one in 327 for the Southeastern Hispanic population, and one in 352 for the Southwestern Hispanic population. Relative to the left glove, he found the presence of the Defendant's and Mr. Bowers's DNA.

Agent Hardy testified that he did not examine the pillow but that he examined the pillowcase. He found a stain on the pillowcase, and his testing failed to show the presence of blood. He found the Defendant's and Mr. Bowers's DNA on the pillowcase. Regarding the Defendant's DNA, he concluded that the probability of an unrelated individual having the same DNA profile was the same as the statistics regarding the right glove. He said that he swabbed the outer perimeter of the pillowcase and that he excluded the presence of the victim's DNA. Regarding the dog cord, an insufficient amount of DNA was found, preventing his excluding the presence of the Defendant's, Mr. Bowers's, and the victim's DNA profiles. His findings were inconclusive.

On cross-examination, Agent Hardy testified that if a cat had walked on the evidence, it were possible but unlikely that the analyses could have been affected. He said that if a cat walked through the scene multiple times, it would increase the chances of contamination but that casual walking from one place to another would not be enough to be detected in the analyses.

Agent Hardy testified that he found a mixture of DNA on the edges of the pillowcase and that based on his analysis, the mixture included DNA from the Defendant and Mr. Bowers. He excluded the victim as a contributor to the DNA mixture. He agreed that if someone had a bleeding cut or wound, it would increase the likelihood of transferring DNA onto a foreign object. He said, too, that the likelihood of transfer increased when the foreign object had a rough surface.

Agent Hardy testified that he analyzed the ski mask at the eye and mouth openings because that was the most likely location of DNA. He agreed that if someone were gasping for breath or trying to scream for help, the likelihood of transferring DNA from the mouth would increase. Relative to the pillowcase, he said he analyzed the edges because of the State's theory that the victim was strangled and smothered with a pillowcase. He agreed he did not find the victim's DNA on the areas analyzed. Regarding his decision not to analyze the center of the pillowcase, he said the probative evidence was not the location of the victim's DNA because the pillow was found on the victim. He said the probative evidence was identifying the DNA of who might have held the pillow over the victim's face.

Agent Hardy testified that the presence of the Defendant's and Mr. Bowers's DNA on the pillowcase might be explained by their living in the house. When asked if his analyses proved the Defendant used the pillow to smother the victim, he said that his analyses only showed the presence of the Defendant's and Mr. Bowers's DNA and that he could not determine how the DNA was deposited on the pillowcase.

On redirect examination, Agent Hardy testified that his examination of the pillowcase probably would not have changed had he known the Defendant stated she had smothered the victim with the pillow. He agreed the Defendant's confession might explain why the Defendant's DNA was on the pillowcase.

Dr. Adele Lewis, an expert in forensic pathology, testified that she performed the victim's autopsy. She said generally, medical examiners needed investigative information from the police in order to determine a cause and manner of death. She said that certain causes of death could not be determined by an autopsy and that the only way to make a diagnosis was to use the history provided by law enforcement. Regarding strangulation, she said ligature marks in the muscles of the neck and breaking of the hyoid bone in the front of

the neck were findings consistent with strangulation. She said "a fair" amount of force was needed to break the hyoid bone. Regarding smothering, she said information from investigating police officers was critical because medical examiners were prohibited from determining a cause of death if a plastic bag were removed from a person's head prior to notifying the police. She said petechial bleeding was also an indication of strangulation and might indicate smothering.

Dr. Lewis testified that before she performed the autopsy, the police told her the victim was found on the floor with a red cord around her neck and a pillow on her face. She concluded to a reasonable degree of medical certainty that the cause of death was asphyxia due to strangulation and smothering and that the manner of death was a homicide. She said usually no physical evidence of smothering was found but noted the victim had petechial hemorrhaging in the eyes, which could have been caused by strangulation or smothering. She identified photographs of the victim's hyoid bone and of the ligature mark on her neck caused by a rope-like object. She concluded that the hyoid bone was broken and noted that she found antemortem bleeding in the bone. She identified a photograph of petechial hemorrhages in the victim's right eye and a photograph of the victim's face, which showed petechiae of the skin around the eyes and an abrasion to the forehead between the eyes. Dr. Lewis noted that the victim's nose was clearly crooked but could not determine whether the nose was injured at the time of death. The victim was 64.5" tall, weighed 102 pounds, and was in fairly good health at the time of her death. No drugs were found in the victim's system.

On cross-examination, Dr. Lewis testified that she would not have concluded the victim was smothered had the police not told her about the pillow covering the victim's face and that the evidence she found indicated strangulation as the cause of death, including the ligature marks around the victim's neck and the broken hyoid bone. She noted the hyoid bone was broken in two places. She agreed "quite a bit of force" was needed to break the hyoid bone and said someone with "a little bit of strength or somebody with a rope or a rope-like object" could have broken the bone.

Dr. Lewis testified that the victim had abrasions on her elbows, shoulder, and hip. She said that although it was possible a struggle occurred at the time of the victim's death, she was unable to date the abrasions. She noted a subgaleal hemorrhage to the top of the victim's head and said it could have been caused by blunt injury. No brain swelling was found, which might indicate the victim died quickly, and no obstructions were found in the victim's throat. She did not find fibers in the trachea or lungs. She found fluid in the victim's lungs and said although it was common to see fluid in the lungs, fluid alone did not necessarily mean the victim died quickly.

On redirect examination, Dr. Lewis testified that her findings were consistent with the victim's dying two minutes after the strangulation began. On recross-examination, she stated that the blood vessels located in the neck flowing to and from the brain were cut off during the strangulation. She agreed the victim could have been unconscious in a matter of seconds.

In the interest of judicial efficiency, the Defendant was permitted to call a witness during the State's proof. Dr. James Walker, an expert in forensic psychology, testified that he evaluated the Defendant after reviewing mental health and medical treatment records and information regarding the present case. He said her previous treatment records showed that she underwent a psychological exam at the Volunteer Behavioral Health Center, underwent a neurological examination in November 2010, and received psychotherapy and psychiatric services at the Personal Growth and Learning Center. He was provided the "suicide note" previously written by the Defendant, her police statement, and the police reports.

Dr. Walker interviewed the Defendant on May 21, 2012, administered several psychological tests, and obtained a personal history. Mr. Walker concluded that the Defendant had multiple "serious" mental health disorders. He concluded the Defendant had major depression in which she experienced frequent "spells of low mood" lasting for more than two weeks. He said other symptoms included low energy, difficulty sleeping, guilty thoughts, preoccupations, loss of appetite, and suicidal thoughts.

Dr. Walker also diagnosed the Defendant with post-traumatic stress disorder as a result of the Defendant's suffering serious trauma and abuse from her father. She claimed she was beaten by her father, sexually abused "over the years," and involved in abusive romantic relationships. Dr. Walker, likewise, concluded that the Defendant suffered from attention deficit hyperactivity disorder in which she had difficulty controlling her behavior. He said the symptoms included impulsivity, difficulty paying attention, and being overly distracted. He noted the Defendant's neurologist concluded that she had the disorder one year before the killing. Dr. Walker noted that the Defendant had chemical dependence disorders associated with pain medication, methamphetamine, benzodiazipine, and alcohol. He further concluded that the Defendant had dependent personality characteristics. The Defendant formed very dependent attachments with others who were stronger willed than she and who she perceived as smarter, brighter, older, and more attractive. He said the Defendant tended to do what others wanted.

Dr. Walker testified that the Defendant complained of a significant degree of introversion and expressed difficulty making friends. Based on a suggestibility test, he concluded that the Defendant was very susceptible to being led or misled and that she had a propensity for being overly suggestible. He said her relationship with Mr. Bowers was "a very disturbed . . . sick relationship." He described the Defendant's multiple motivations for

being with Mr. Bowers. He said that the Defendant did not have a good relationship with her mother and felt like an outcast among her family and that Mr. Bowers provided her a place to live. Dr. Walker believed the Defendant developed a very strong emotional attachment to Mr. Bowers, although he physically abused, raped, and controlled her.

Dr. Walker testified that although he did not form an opinion about whether the Defendant was capable of premeditation on the day of the killing, he concluded that her ability to premeditate was significantly impaired. He said the Defendant was abusing Dilaudid, which caused "gross intoxication in most people." The Defendant was also taking Suboxone, a medication designed to help people stop abusing pain medication. He said these drugs affected the ability to reason, think, and make good decisions. He concluded to a reasonable degree of medical certainty that the Defendant was not "in a state where she could exercise good reasoning or . . . judgment" based on the drug abuse, mental disorders, and abusive relationship with Mr. Bowers.

Dr. Walker testified regarding the Defendant's confession that the Defendant's emotional state and her willingness to take responsibility for the killing were factors consistent with her providing a truthful statement. He said, though, that other factors raised concerns about the truthfulness of her statement. The Defendant told Dr. Walker that she and Mr. Bowers discussed what they would tell the police if they were caught. The Defendant claimed that Mr. Bowers said he would not "go[] down" for the killing alone and would "take her with him." The Defendant admitted to Dr. Walker that she and Mr. Bowers conspired about what "they" would admit and what she would admit. He noted the Defendant feared Mr. Bowers generally. The Defendant told Dr. Walker that Mr. Bowers would attempt to harm her. The Defendant claimed Mr. Bowers raped her twice and threatened to kill her after they fled the state.

Dr. Walker testified that the Defendant's tendency to be very suggestible led him to question the truthfulness of her police statement. He noted the Defendant's willingness after the killing to attempt suicide upon Mr. Bowers's suggestion. He agreed the Defendant admitted attempting suicide previously by cutting herself or taking pills, injecting nicotine into her veins, ingesting carbon monoxide, and placing a hair dryer into a bathtub of water. Dr. Walker stated that the Defendant's attempt to take her life after the killing should be considered in determining the veracity of her confession. He said people in disturbed relationships, like the Defendant and Mr. Bowers's relationship, sometimes "project a front to the world of having it altogether . . . being loving, being affectionate to one another." He said this could explain the Defendant's normal demeanor after the killing.

-17-

On cross-examination, Dr. Walker testified that he did not administer the MMPI test because the test was inappropriate for a seventeen-year-old girl. He said a subject needed to be at least eighteen years old.

Dr. Walker testified that the previous records he reviewed showed the Defendant had met with two physicians once each, a support staff member with a master's degree once, and another support staff member several times. He agreed he had copies of the Defendant's statements to Yolande Bailey and Rebecca Kinder. Dr. Walker could not say if the Defendant was truthful and accurate in her statement to him. He agreed the Defendant was the only person who might benefit from lying to him.

Dr. Walker testified that the Defendant's psychomotor skills were normal, that she was alert and oriented, that her speech was fluent and articulate, and that her language comprehension was intact. He agreed the Defendant did not suffer from preoccupations, obsessions, or delusions. The Defendant's affect was normal, her social skills were good, and she was cooperative. She showed no signs of malingering and had an IQ of 95, indicating an average range of intellect. He agreed that the Defendant showed no signs of deficiencies in her ability to reason or to think and showed no signs of dysfunction in her executive reasoning abilities.

Dr. Walker testified that his post-traumatic stress and attention deficit hyperactivity diagnoses were based upon the Defendant's 2010 neurological examination. Regarding the Defendant's substance abuse problems, he agreed the Defendant had been drug free for months before the evaluation but said his "review of the records indicated a different story was more accurate." He said that although the Defendant lied, he was required to consider her statements in light of all the evidence. He said that the Defendant's statements were the only evidence of Mr. Bowers's raping, beating, and controlling her. He said that although it was possible the Defendant provided false or misleading information during the evaluation, indications showed that some information was true.

Dr. Walker testified that trial counsel asked him to clarify in a second report whether the limitations in the Defendant's mental condition on the day of the killing would have been due to a mental disorder or defect. After reviewing his original report, he agreed he concluded that the Defendant's confession to the police was not the result of duress or coercion. He agreed that the Defendant complained of a headache on the day of the killing, denied going to school, said she argued with her mother on the telephone, and said Mr. Bowers insisted upon listening to her conversation. This statement was consistent with her police statement, but Dr. Walker acknowledged the remainder of her statement to him was inconsistent with her police statement. He agreed the Defendant's telling him that she called her mother to pick her up and that Mr. Bowers was upset about the Defendant's relationship

with her friend Natalie was the first time the Defendant had ever mentioned these topics. He, likewise, agreed that when he first interviewed the Defendant, she first mentioned her mother's not coming to pick her up, Mr. Bowers's placing the dog cord around her neck and threatening to kill her, and exchanging punches with Mr. Bowers. He said it would not surprise him that many of the Defendant's belongings were not packed and that no ligature marks were on the Defendant's neck when she was arrested. He agreed the Defendant's telling him that she vomited upon seeing Mr. Bowers strangle the victim and that she played no role in the killing was inconsistent with her police statement.

Dr. Walker testified that although he thought it was odd the Defendant slept after Mr. Bowers allegedly threatened to choke her with the dog cord, he said the Defendant was using Dilaudid, which usually caused the person to sleep. He agreed, though, that the Defendant never mentioned to him that she was using drugs. He said it was accurate to conclude that the Defendant used drugs on the date of the crime, whether or not she participated in the killing. Dr. Walker was unaware the Defendant's DNA was found on the pillow covering the victim's face and said the Defendant denied placing the pillow on the victim. He agreed it was possible the Defendant lied. He agreed that although the Defendant told the police she received a portion of the money that was stolen from the victim, she did not tell him that she received money. The Defendant also did not tell Dr. Walker that they drove to Sparta to buy drugs after the killing.

Dr. Walker testified that the Defendant's ability to premeditate was not impaired on the day he conducted his evaluation. The Defendant told Dr. Sandra Phillips that she did not use drugs on the day of the killing, and Dr. Walker admitted this conflicted with what the Defendant told him. He agreed the Defendant lied to him or to Dr. Phillips. He denied the Defendant told him that she and Mr. Bowers went to different stores to buy items after the killing, and he admitted this was important information.

Dr. Walker testified that the video recordings from the convenience and grocery stores indicated that the Defendant did not provide a complete account of what happened on the day of the killing. He said that he was not surprised that the Defendant looked at a map and planned how to drive to Indiana just after the killing but that it did not impact his conclusions. He said he did not have to believe the Defendant was truthful for his assumptions to be accurate. He believed that the Defendant was honest at times and misleading at others. He noted Mr. Bowers's threatening to push her into the lake and said the statement was probably true given the detail of her statement. He said if the statement were false, she would have said Mr. Bowers told her that she would drown, not die of hypothermia. He conceded it was possible the Defendant created this detail after having more than one year to think about it.

On redirect examination, Dr. Walker testified that many of the Defendant's statements to him were corroborated by previous reports he reviewed and that the reports from the Defendant's previous doctors corroborated his diagnoses. He said the Defendant's behavior after the killing was "perfectly consistent" with his diagnoses. When told that no evidence had been presented showing the victim's DNA was on the pillow, he said that the lack of DNA was consistent with the Defendant's statement during his evaluation. On recross-examination, he agreed the Defendant knew right from wrong and was able to conform her conduct with that reasoning. On further redirect examination, he stated, though, that the Defendant's ability to premeditate might have been impaired on the day of the killing.

Dr. Sandra Phillips, an expert in the field of clinical psychology, testified that she was employed with Volunteer Behavioral and that she evaluated the Defendant on February 1, 2011, less than two months before the trial. Based on her evaluation, she concluded that the Defendant was competent to stand trial and was not mentally ill. She diagnosed the Defendant with adjustment disorder with a depressed mood. She explained the Defendant had a relatively low level of depression in response to her legal concerns. She also provisionally diagnosed the Defendant with post-traumatic stress disorder and with emerging borderline personality traits.

Dr. Phillips testified that she concluded the Defendant did not have a severe mental disease or defect at the time of the killing rendering her unable to appreciate the nature or the wrongfulness of her conduct. She also concluded that the Defendant was capable of premeditation on the day of the killing. She noted the Defendant reported emptying her backpack at the victim's house in order for other people to learn she had been at the house in the event something happened to her. The Defendant denied using drugs before the killing, although Dr. Phillips later learned the Defendant told the police she had used drugs.

Dr. Phillips testified that the Defendant denied participating in the killing. The Defendant told Dr. Phillips that the victim arrived home around 5:30 p.m. and that the Defendant was in the bedroom packing her belongings. The Defendant was "somewhat calmer" but worried about what was going to happen because after taking a shower, Mr. Bowers placed a dog cord around her neck, pulled it, and laughed. The Defendant suspected Mr. Bowers was going to kill her or the victim because earlier that day Mr. Bowers threatened to "strangle the b----." The Defendant denied using drugs and drinking alcohol for several weeks. The Defendant overheard Mr. Bowers and the victim arguing about a broken car window and a hole in the bedroom door. The Defendant claimed Mr. Bowers threw things at her, which caused the hole, and called her a "stupid c---." The Defendant wanted to call her mother, but she could not find the house telephone and Mr. Bowers had

her cell phone. The Defendant reported that after the arguing, she heard nothing. Then, she heard something falling down. The Defendant said she was "frozen terrified."

Dr. Phillips testified that the Defendant described the killing. The Defendant saw Mr. Bowers with his feet against the victim's back while he choked the victim with the dog cord. The Defendant dropped to her knees and asked Mr. Bowers, "God, what have you done[?]" Mr. Bowers struck the Defendant on the head and said, "[N]one of that God s---, it's hail Satan, my dark lord master." The Defendant claimed the victim was lying on the floor in the hallway. Mr. Bowers walked away and returned with a gun. He pointed it at the Defendant, told her to get up and to get in the car, and threatened to kill her if she attempted to run or "do anything stupid." The Defendant claimed to have emptied her backpack inside the house so the authorities and her family would know she had been there.

Dr. Phillips testified that the Defendant reported that Mr. Bowers showed her $400 he took from the victim's body. They drove to Sparta, where Mr. Bowers bought $200 to $300 worth of Dilaudid. Mr. Bowers told the Defendant that she had two days to live because he believed the victim would be found by then. The Defendant and Mr. Bowers stopped at Standing Stone, and the Defendant believed he was going to kill her. They stopped at a bridge, and Mr. Bowers grabbed her hair, shoved her face over the wall, and threatened to kill her if she refused to do what he wanted. The Defendant claimed the killing occurred because she was going to leave Mr. Bowers, who told her that she was supposed to have loved him and that nobody could have her if he could not.

Dr. Phillips testified that the Defendant said Mr. Bowers drove to Indiana in order for the Defendant to see her grandmother one last time before he killed her. During the drive, Mr. Bowers talked about the humorous look on the victim's face and the victim's inability to defend herself. Mr. Bowers told the Defendant that he placed the victim's body in the second bedroom, made the victim presentable, and covered her face with a pillow. The Defendant claimed that she somehow obtained her cell phone when they stopped at the rest area and wanted to call a friend but realized that the volume was too high and that Mr. Bowers could hear any conversation. Mr. Bowers saw the Defendant with her phone and escorted her to the car. Mr. Bowers told her to remove her pants, and when she refused, he tore off her pants and underwear and raped her.

Dr. Phillips testified that the above version of events was inconsistent with the Defendant's statement to the police in Indiana. She noted the Defendant mentioned to her about going to the convenience store and to Food Lion after the murder. She did not know if the Defendant was truthful.

On cross-examination, Dr. Phillips testified that she reviewed the Defendant's previous medical records and agreed that the Defendant was raised in an abusive home. She agreed the Defendant's father abused the Defendant, the Defendant's mother, and the Defendant's stepmother. She agreed the abuse had a severe adverse effect. She read Dr. Walker's report and agreed the Defendant had "severe mental illness." Although the Defendant gave three different versions of the events, Dr. Phillips did not think the Defendant was malingering.

Dr. Phillips testified that the Defendant's relationship with Mr. Bowers was abusive based on the Defendant's statement. She denied administering tests to determine the Defendant's level of susceptibility and said that such tests would not show the Defendant's mental condition on the day of the offense. She disagreed with Dr. Walker's conclusion that the Defendant could have lacked the ability to commit premeditated murder. She agreed, though, that the Defendant had "less than the average capacity of a normal person."

On redirect examination, Dr. Phillips testified the Defendant had the ability to form the required intent of premeditation. On recross-examination, she stated that a clinical psychologist was not able to determine definitively whether the Defendant had a diminished capacity at the time of the killing. She agreed, though, with Dr. Walker's conclusion that the Defendant "could have been diminished."

Dr. James Girard testified for the defense as an expert in DNA analysis. He reviewed Agent Hardy's report regarding the DNA analyses. He agreed with portions of the Agent's conclusions but disagreed with others. Relative to Agent Hardy's analysis of the pillowcase, Dr. Girard said Agent Hardy assumed the victim was "not included in the analysis." Dr. Girard stated that the DNA sample was a mixture of three contributors, including the victim. With regard to the statistics of another person matching the DNA profiles found on the pillowcase, Dr. Girard believed Agent Hardy overstated the data. He concluded that the high million numbers reported by Agent Hardy were inaccurate.

Dr. Girard testified that he expected the victim's DNA to be on the pillow if it were laid on the victim's face. He agreed with Agent Hardy regarding the number of variables that played a role in whether DNA would be transferred to the pillow from the abrasion on the victim's forehead. He expected that more DNA would be found on the pillow if it were used to smother the victim.

On cross-examination, Dr. Girard testified that if the victim were smothered with the pillow, he would expect to find the victim's DNA on the perimeter of the pillow where Agent Hardy swabbed it. He said that a small dog was present at the scene and that the dog may have contaminated the DNA evidence. He agreed the documents he received did not mention

the dog and said trial counsel told him a small dog was present. He admitted he should have also considered during his analysis the Defendant's confessing to using a pillow to smother the victim.

Dr. Girard testified that he disagreed with Agent Hardy's conclusions regarding the right and left gloves and the ski mask because the samples analyzed were of such a low concentration that the profiles could not be determined confidently. He agreed with Agent Hardy's conclusion that the DNA analysis was inconclusive regarding the section of the cord found around the victim's neck, although Dr. Girard's report found the Defendant's DNA was not present on the cord. He agreed that the victim's DNA was the only DNA present in the nail clippings and said he would not have expected any other DNA to be found based on evidence that the victim was unable to defend herself and had arthritic hands.

On redirect examination, Dr. Girard testified that he knew the State's theory was the victim was smothered with a pillow. He said that based on the State's theory, he would have expected to find the victim's DNA on the pillow and that her DNA was not on it. He said that had he known a cat was inside the crime scene, rather than a dog, his conclusions would not have changed.

Dr. Girard testified that he disagreed with Agent Hardy's conclusions that the victim's DNA was not present on the items analyzed and that Agent Hardy's excluding her DNA profile "drastically change[d]" the results. He agreed that the results would have been in the Defendant's favor had the victim's DNA not been excluded. He agreed with Agent Hardy's conclusion that the DNA analysis was inconclusive regarding the dog cord found around the victim's neck and said it was possible the DNA evidence degraded between the time the evidence was collected and analyzed.

Kimberly Coffel, the Defendant's mother, testified that her relationship with the Defendant's father was abusive and that the Defendant witnessed the abuse. On one occasion, the Defendant's father picked up Ms. Coffel by her throat while the Defendant was present. The Defendant cried and said, "[P]lease stop, please stop." She said the Defendant did not understand what was happening when the Defendant's father became violent.

On cross-examination, Ms. Coffel testified that she talked to the Defendant on the day of the killing. She denied she told the Defendant to return home because she had stopped receiving food stamp benefits. She also denied threatening to report the Defendant and Mr. Bowers to the police for committing crimes. Ms. Coffel said she told the Defendant to come home and that she did not want to involve the police. When asked if she threatened to have Mr. Bowers arrested for statutory rape, she said she told the Defendant that she could have

Mr. Bowers put in jail. The Defendant had been living with Mr. Bowers for one month. Ms. Coffel admitted she did not know where they were staying.

Insurance Agent Rick Savage testified that he last saw the victim in September or October before the killing. The victim came to his office. She was upset about something related to her grandson, and he advised her to contact the sheriff's department.

Overton County Sheriff D.W. Melton testified that he knew the victim and saw her on several occasions before her death. The victim spoke to him about her grandson, and he advised her to throw Mr. Bowers out of her house. He saw bruises on the victim's arm the last time she came to the sheriff's office to talk to him, and he said the victim was upset each time they talked.

Tina Webb testified that she knew the Defendant and saw her at Food Lion thirty days before the killing. They exchanged pleasantries, and at the end of their conversation, the Defendant "clammed up." Ms. Webb was unsure why the Defendant's demeanor changed but noticed Mr. Bowers was approaching at that time. She felt as though the Defendant "cut her off" and something was wrong.

On cross-examination, Ms. Webb testified that she did not know what occurred after she saw the Defendant but before the killing. On redirect examination, she stated that the Defendant was very happy and that it was unusual for the Defendant to clam up.

Chelsea Hanna testified that she had known Mr. Bowers for about ten years. She said they dated on and off for eight years, lived together twice, and were engaged to be married twice. They had lived with the victim. She saw the victim and Mr. Bowers argue but denied witnessing physical violence.

Ms. Hanna testified that in June 2010, Mr. Bowers moved into her apartment after Mr. Bowers attended a rehabilitation program. Mr. Bowers lived with her until September. She said that while they lived together, Mr. Bowers took many of her belongings and sold them. Mr. Bowers was unemployed, and Ms. Hanna expected Mr. Bowers to "take care of things . . . pick up after himself." She said they argued when they discussed her expectations. She said Mr. Bowers yelled, screamed, and punched holes in the walls when he became angry. She only saw Mr. Bowers punch holes in the walls at the victim's house. During their last argument, the Defendant threw her on the floor and punched her.

On cross-examination, Ms. Hanna testified that she never killed anyone during the time in which she dated and lived with Mr. Bowers. On redirect examination, she stated that she had never been diagnosed with any severe mental disease.

Upon this evidence, the jury found the Defendant guilty of first degree murder, felony murder during the commission of an especially aggravated robbery, conspiracy to commit first degree murder, especially aggravated robbery, and theft of property. The trial court merged the murder convictions and sentenced the Defendant to life imprisonment with the possibility of parole. The Defendant was later sentenced to concurrent sentences of fifteen years for conspiracy to commit first degree murder, fifteen years for especially aggravated robbery, and two years for theft. This appeal followed.

## I & II

### Sufficiency of the Evidence & Motion for a Judgment of Acquittal

The Defendant contends that the evidence is insufficient to support her first degree murder conviction. In a related issue, she contends that the trial court erred by denying her motion for a judgment of acquittal. Regarding each issue, she argues that the evidence failed to show that the victim's DNA was on the pillow used to smother the victim, that the evidence showed overwhelmingly that Mr. Bowers strangled the victim, and that the evidence showed an antagonistic relationship between Mr. Bowers and the victim. The State responds that the evidence is sufficient and that the trial court properly denied the Defendant's motion. We agree with the State.

The standard of review for a trial court's denial of a motion for a judgment of acquittal is the "same standard that applies on appeal in determining the sufficiency of the evidence[.]" *State v. Little*, 402 S.W.3d 202, 211 (Tenn. 2013). In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given to the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)*; see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see also State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Although the Defendant states that the evidence is insufficient to support her convictions, her argument focuses on her first degree murder conviction because of its importance to the remaining convictions. Relevant to this case, first degree murder is the unlawful, intentional, and premeditated killing of another. T.C.A. §§ 39-13-201 (2014), 39-13-202(a)(1) (2014). In the context of first degree murder, intent is shown if the defendant has the conscious objective or desire to cause the victim's death. *State v. Page*, 81 S.W.3d 781, 790-91 (Tenn. Crim. App. 2002); T.C.A. § 39-11-106(a)(18) (2010) (amended 2011, 2014) (defining intentional as the "conscious objective or desire to engage in the conduct or cause the result"). "It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." T.C.A. § 39-13-202(d) (2014). "The element of premeditation is a question for the jury which may be established by proof of the circumstances surrounding the killing." *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006). As a result, the jury "may infer premeditation from the manner and circumstances of the killing." *State v. Jackson*, 173 S.W.3d 401, 408 (Tenn. 2005); *see State v. Vaughn*, 279 S.W.3d 584, 595 (Tenn. Crim. App. 2008). Our supreme court has provided a list of factors which "tend to support the existence" of premeditation and deliberation. *See Bland*, 958 S.W.2d at 660. The list includes the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. *Id*. (citing *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992); *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1997)).

The record reflects that the Defendant and codefendant Bowers lived at the victim's residence. The victim was found in the Defendant and Mr. Bowers's bedroom with a pillow over her face and a cord around her neck. A separate portion of the cord was found in the Defendant and Mr. Bowers's bedroom. The police found no evidence of forced entry and noted no windows or doors were broken, and the victim's car was missing. The Defendant and Mr. Bowers were found in Indiana the day after the killing and in possession of the victim's car. Inside the victim's car was a handwritten note signed by the Defendant stating that if the letter was found, the reader knew what happened. She explained she wanted Mr. Bowers's last name and wanted to be cremated with him.

Just hours after the killing, the Defendant and Mr. Bowers were seen at a convenience store. The record reflects that while there, the Defendant engaged in casual conversation about traveling to Indiana and her need to look at a map. Ms. Ogletree, the Raceway Store Manager, testified that the Defendant acted normal and was happy to be traveling to Indiana.

After being arrested and taken to the police station in Indiana, the Defendant told Ms. Kinder, a paramedic, that she and Mr. Bowers unsuccessfully attempted suicide. When Ms. Kinder asked the Defendant for her mother's contact information, the Defendant refused.

-26-

The Defendant stated that although she had been living at the victim's home with Mr. Bowers and with her mother's consent, her mother threatened to have Mr. Bowers arrested for statutory rape if she did not return home. The Defendant believed her mother's motivation was linked to her no longer receiving financial assistance in the Defendant's absence. While upset and crying, the Defendant told Ms. Kinder that "[I]t's never going to be okay, I shouldn't have done it, I shouldn't have hurt her, I just wish I hadn't done it." Ms. Kinder asked if someone needed medical assistance, and the Defendant said Ms. Kinder could not help because "she" was in Tennessee. The Defendant said, "[Y]ou can't help her, we killed her, oh my God, I wish I hadn't done that, oh my God, I wish I hadn't done that." The Defendant told Ms. Kinder that her boyfriend "got behind her, took a dog leash and strangled her and I put a pillow on her face and smothered her, oh my God, oh my God, I just wish I hadn't done it." Ms. Kinder was adamant that the Defendant said "we" killed the victim, not "he." Ms. Bailey, another paramedic, provided similar testimony regarding the Defendant's statements about her role in the victim's killing and added that the Defendant said they killed the victim for money.

The Defendant told Indiana officers that the plan to kill the victim began with the Defendant's mother threatening to have Mr. Bowers arrested for statutory rape. The Defendant claimed that the mother's threat was the result of the State's terminating her mother's food stamp benefits because the Defendant was no longer living with her. After the threat, the Defendant and Mr. Bowers decided they were going to jail together. The Defendant said a "little comment" was made that they could kill the victim. She noted the victim always nagged them. She and Mr. Bowers discussed the fact that they would have a car and money if they killed the victim and that they could spend whatever time they had together. Mr. Bowers mentioned using a hammer, but the Defendant suggested strangling the victim with the dog cord because she did not want to see the victim's blood. She also admitted she thought of using the dog cord and smothering the victim. She said that after Mr. Bowers began to strangle the victim, he yelled for her assistance. She left their shared bedroom with a pillow, walked to where the victim and Mr. Bowers were located, placed the pillow on the victim's face, and pressed down on the victim's face. The Defendant told the officers not to place all the blame on Mr. Bowers because she helped kill the victim, and she admitted Mr. Bowers did not tell her to use the pillow. The Defendant also admitted that she "helped smother" the victim. She said she deserved the death penalty for her role in the killing.

The Defendant's confession was corroborated, in part, by Mr. Bowers's statement to the police. Mr. Bowers told the police that he and the Defendant discussed how they would stay together and that "[w]e figured we would kill my Grandmother and take her money." He said the Defendant's mother called earlier that day and threatened to call the police to bring the Defendant home. Mr. Bowers reported that the Defendant thought of choking the

victim with the dog cord. He and the Defendant packed their belongings before the victim arrived home, and he cut the leash with the wire cutters, leaving the cutters in their bedroom. When the victim arrived home, Mr. Bowers approached from behind, placed the leash around her neck, and choked her. He called for the Defendant's assistance. He said the Defendant left their bedroom with a pillow and placed it over the victim's face. As Mr. Bowers pulled the leash tight, the Defendant lay on the victim and applied pressure on the pillow. Mr. Bowers took money from the victim's right sock, and they left in the victim's car. The Defendant's and Mr. Bowers's confessions each referenced the same date and time of the killing, the Defendant's suggesting the dog cord to kill the victim, Mr. Bowers's placing the dog cord around the victim's neck, the Defendant's placing a pillow over the victim's face, and the motive of needing money and a car to leave town. The confessions also referenced the Defendant's mother's threats.

Likewise, the evidence found at the crime scene and during the autopsy corroborated the Defendant's and Mr. Bowers's statements to the police. The video recording of the scene corroborated the Defendant's statement that the victim was strangled with the dog cord. Although an insufficient amount of DNA was found during the analysis, Agent Hardy could not conclude that Mr. Bowers's and the Defendant's DNA was not on the cord. Further, the pillowcase showed the presence of the Defendant's DNA around the outer edge, and Agent Hardy agreed the Defendant's confession could explain the presence of her DNA on the pillowcase. Regarding the medical examiner's findings, Dr. Lewis concluded that the cause of death was asphyxia due to strangulation and smothering. The victim had petechial hemorrhaging and ligature marks consistent with strangulation, and Dr. Lewis stated that the hemorrhaging could have also been caused by smothering. Further, the victim's hyoid bone was broken twice and was also indicative of strangulation.

We conclude that the evidence is sufficient to support the Defendant's first degree murder conviction. Although the Defendant argues that the victim's DNA was not found on the pillow found on the victim's face and cites to Dr. Girard's testimony regarding the DNA analysis, Agent Hardy testified that the purpose of his analyses was to identify the presence of the perpetrators' DNA, not the victim's DNA. The Defendant's DNA was found on the pillow, and she and Mr. Bowers told the police that she smothered the victim with the pillow. Mr. Bowers told the police that the Defendant had the initial idea of killing the victim. Any conflicts in the testimony were resolved by the jury as the trier of fact. *See Bland*, 958 S.W.2d at 659. The Defendant also argues that the evidence shows the victim was strangled by Mr. Bowers. However, Dr. Lewis concluded that the victim was also smothered. In any event, the Defendant was criminally responsible for Mr. Bowers's conduct when she assisted Mr. Bowers during the killing and afterward in taking the victim's money and car in an effort to be together.

In addition to first degree premeditated murder, the Defendant was convicted of felony murder during the commission of an especially aggravated robbery, an alternative theory of criminal liability for first degree murder. *See Carter v. State*, 958 S.W.2d 620, 624-25 (Tenn. 1997); T.C.A. § 39-13-202(a)(2), (b) (2014). Although she does not challenge her felony murder conviction, we conclude that the evidence is sufficient. The record reflects that the Defendant and Mr. Bowers discussed how they could stay together after the Defendant's mother threatened to have Mr. Bowers arrested. Mr. Bowers's written statement to the police shows that they discussed killing the victim and taking her money in order to stay together and "go out with a bang." They decided to kill the victim with a dog cord and a pillow and to take the victim's money she kept in her sock. The Defendant told the police that Mr. Bowers took $200 from the victim's body and that they took the victim's car after the killing to drive to Indiana. The Defendant and Mr. Bowers were seen making purchases at convenience and grocery stores after the killing, and the Defendant claimed they drove to Sparta to purchase drugs after the killing. Ms. Bailey testified that the Defendant said they killed the victim for money. The record clearly shows that the Defendant participated and assisted in an intentional or knowing theft of property from the victim by violence with the use of a deadly weapon. *See* T.C.A. §§ 39-13-401(a) (2014), 39-13-403(a)(1)-(2) (2014), 39-11-402(2) (2014). The record also shows that the Defendant benefitted from taking the victim's money. The Defendant is not entitled to relief on this basis.

### III

### Motion to Suppress

The Defendant contends that the trial court erred in denying her motion to suppress the evidence of inculpatory statements she made to emergency medical personnel and Indiana police officers. She contends that the statements were involuntary because they were improperly obtained through direct or indirect threats, intimidation, coercion, and improper influence. She also contends that her communications with the paramedics were protected by Tennessee Code Annotated section 24-1-207 (2000) (psychiatrist/patient privilege). The State argues the trial court properly denied the Defendant's motion to suppress. We agree with the State.

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence."

*State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998); *see State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). A trial court's application of the law to its factual findings is a question of law and is reviewed de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). In reviewing a trial court's ruling on a motion to suppress, this court may consider the trial evidence as well as the evidence presented at the suppression hearing. *See State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998); *see also State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012).

The statements in question were made on December 12, 2010. The proof at the suppression hearing showed that around 8:05 a.m., Tennessee authorities requested ISP Sergeant Matthew Collins's assistance in investigating a car theft and two persons of interest in a Tennessee homicide. A Gas City Indiana police officer found the stolen car at the Defendant's grandparents' house around 11:13 a.m. The Defendant and Mr. Bowers were inside the house and were transported to the Gas City Police Department around 11:23 a.m. At the police station, paramedic Rebecca Kinder evaluated the Defendant, and paramedics Yolande Bailey and Justin Black evaluated Mr. Bowers. The evaluation was due to a report that the Defendant and Mr. Bowers had attempted suicide. The Defendant made incriminating statements to Ms. Kinder, which were overheard by Ms. Bailey. The Defendant, who was sixteen years old, was later taken to a juvenile detention facility. Sergeant Collins and Deputy Chad Hammel arrived at the juvenile facility about 6:50 p.m., and they began interviewing the Defendant at 7:05 p.m. After being advised of her *Miranda* rights, the Defendant signed a written waiver at 7:17 p.m. and inculpated herself and Mr. Bowers in a recorded statement.

Sergeant Collins testified at the suppression hearing that he was first contacted about the case by Overton County Sheriff's Deputy John Mackie, who requested his help finding the Defendant and Mr. Bowers. He did not recall their discussing whether he would question the Defendant, if located. The victim's car was found at the Defendant's grandparents' house, and the suspects were found inside the house and taken to the police station. The grandparents were interviewed, and the car was impounded.

Sergeant Collins testified that when he arrived at the police station, an ambulance was outside the building. He took statements from Ms. Bailey and Ms. Kinder. He said the Defendant appeared fine physically. He did not recall her clothes being wet.

Sergeant Collins testified that because the Defendant was a juvenile and her mother was in Tennessee, he talked to the district attorney's office in Tennessee about interviewing her. He faxed a copy of the ISP Advice of Rights and Waiver form to the district attorney in Tennessee. It was his understanding that Tennessee authorities explained the situation and the form to the Defendant's mother and obtained her permission for the Indiana authorities

to interview the Defendant. He received the form, signed by the Defendant's mother, by fax. He said he talked to other Tennessee law enforcement personnel. He did not recall anyone telling him that the Defendant's mother did not want the Defendant interviewed or that the Defendant's mother initially refused permission before later signing the waiver form.

Regarding the statement Sergeant Collins and Deputy Hammel took from the Defendant at the juvenile detention facility, Sergeant Collins testified that he advised the Defendant of her rights. He told the Defendant that her mother had signed a waiver for her to speak with Indiana authorities and showed her the form. She signed the waiver. The form the Defendant signed was received as an exhibit and stated in part, "If you are a juvenile, you have the right to talk with your parent or guardian before any questioning and to have them with you during such questioning."

Sergeant Collins testified consistently with his trial testimony regarding the substance of the Defendant's statement. A recording of the interview was received as an exhibit. He stated that the Defendant related the events in narrative form and that he only asked a few questions to elicit details. He said Deputy Hammel asked some questions. He said the Defendant was upset and cried at times, although he did not see many tears. He said that her communication was coherent and that she did not appear intoxicated, injured, or in ill health, only emotional. He said he never promised leniency. She did not ask to have a parent present for the statement. He said that in hindsight, they could have taken the Defendant's statement the following day.

Rebecca Kinder, who was a volunteer paramedic on December 12, 2010, testified that she, Yolande Bailey, and Justin Black responded to the police station regarding a possible overdose. She did not speak with any officers about the reason the Defendant was there. She assessed the Defendant. Ms. Bailey and Mr. Black assessed Mr. Bowers, who was in a another room. She said officers asked the Defendant for her mother's name and contact information, which the Defendant initially refused. The Defendant stated her mother did not care and was "nothing but a drunk." She said that she had been staying with her boyfriend's grandmother, that her mother wanted her to come home to prevent her mother from losing food stamp benefits, and that her mother threatened to have Mr. Bowers prosecuted for statutory rape if the Defendant did not come home. The Defendant stated that she and Mr. Bowers injected nicotine water. When Ms. Kinder asked why the Defendant was "soaking wet," the Defendant stated she and Mr. Bowers tried to kill themselves in a bathtub with appliances because they wanted to be together forever. The Defendant said she was sorry she had hurt a woman in Tennessee and wished she had not. The Defendant said she and her boyfriend killed the victim when he choked the victim with a dog cord and she put a pillow on the victim's face. Ms. Kinder said she did not say anything to elicit the Defendant's statements. She said Ms. Bailey came into the room during the Defendant's admissions and

heard part of it. Ms. Kinder said she was surprised by the Defendant's admissions and left the room.

Ms. Kinder said the Defendant's vital signs were normal. She said the Defendant cried and appeared upset. The Defendant reported that she felt slightly nauseous, which Ms. Kinder thought might be from the nicotine water. The Defendant thought she might be pregnant. Ms. Kinder said the Defendant was not handcuffed and did not recall if the Defendant was shackled. She said it never crossed her mind that the Defendant was in custody. She said she was there to assess a patient who had attempted suicide.

Yolande Bailey testified that she went to the Gas City Police Department on December 12, 2010, regarding a possible suicide attempt. An officer told her that the Defendant and Mr. Bowers were there for questioning about a Tennessee homicide. She did not think she told Ms. Kinder this information. She and Mr. Black assessed Mr. Bowers while Ms. Kinder assessed the Defendant. Mr. Bowers refused treatment, and Ms. Bailey went into the room where Ms. Kinder was assessing the Defendant to complete her paperwork. She heard Ms. Kinder ask the Defendant about who had been hurt, referring to the victim, and how the authorities could help the person. She did not think about the propriety of the questioning and continued doing paperwork. She said, though, she was concerned when she heard the Defendant say they killed the victim. Ms. Kinder went to find an officer. She said an officer "quickly went into there and advised for it to stop." She said the Defendant's clothes appeared to be "soaking wet," and she thought Mr. Bowers's clothes were wet. She said the Defendant may have had a blanket.

Kimberly Coffel, the Defendant's mother, testified for the defense. She said that before December 12, 2010, the Defendant had been living away from home for a month with "Ben," whose last name she did not know. She thought they lived next door to the crime scene. She said she had been by the home but had not visited it to check on her daughter in the month before the crime. She said she and the Defendant "were having some problems." She thought that she would give the Defendant one month away from home to live as an adult and that the Defendant would decide to return home. She said that although she and the Defendant were "essentially estranged" and did not speak daily, she talked to the Defendant's school counselor daily.

Ms. Coffel testified that she talked to her daughter on the Friday before Sunday, December 12, 2010. She said she told the Defendant that she had called Child Protective Services for assistance in getting the Defendant home. She acknowledged saying she could have Mr. Bowers jailed but did not think she said she could have him prosecuted for statutory rape. She said she talked to the Defendant about a letter she received notifying her that her food stamp benefits would decrease because the Defendant was not living with her. She said,

though, she did not care about the benefits and wanted the Defendant home. She said the call did not end well.

Ms. Coffel testified that on December 12, 2010, at 9:00 a.m., Sheriff Melton, Assistant District Attorney General Gore, and District Attorney General's Investigator Kendall Hargis came to her house and asked about the Defendant and her possible whereabouts. She said that despite her repeated inquiries, they would not tell her anything except that it was serious. After they left, Ms. Coffel spoke with her mother by telephone and learned the Defendant was at Ms. Coffel's mother's house. She called Mr. Hargis and advised him of the Defendant's location. Sheriff Melton called her around 10:00 or 10:30 a.m. and said the Defendant had been detained. She said she called the Gas City Police Department before 11:00 a.m. and told Officer Keith Emmons that she did not want the Defendant questioned without an attorney present. He told her the Defendant was being taken to juvenile detention. She called the juvenile detention facility and advised Officer Tetter that the Defendant was being transported to the facility and that the Defendant should not be questioned until an attorney or Ms. Coffel was present. She said she told Mr. Hargis the same thing.

Ms. Coffel testified that around 11:00 a.m., Mr. Gore, an unidentified officer, and District Attorney General York came to her house with a document they wanted her to sign allowing the Defendant to be questioned. She said they would not tell her what was going on other than that it was serious. She said she declined to sign the document, and Mr. York told her that the matter was serious and that if she did not sign it, he would prosecute the Defendant to the fullest extent of the law. She said that Mr. York told her that the Defendant would probably spend the rest of her life in prison, that it would be best for everyone if she signed the document, and that if she signed it, the Defendant would likely get out of prison someday. She said she felt pressured and intimidated and was "blatant" in saying "no, no." She said Mr. Gore told her it would be better for everyone if she signed the document. She said her boyfriend was nervous and told her maybe she should sign. She said that although she told herself the Defendant should not be questioned without an attorney present, she ultimately signed the document after making telephone calls. She said she did not "really read" the document and trusted what the State's representatives told her. She did not think anyone else came to her house that day.

Ms. Coffel testified that she did not recall the State's representatives telling her that the Defendant was a suspect in a murder but acknowledged they said there had been a homicide. She said the sheriff had advised her earlier that there had been a homicide but did not identify the victim. She said she wanted to talk to the Defendant, but no one told her that she could. She said no one told her that she had the right to visit the Defendant daily unless prohibited by court order or that the Defendant had a right to a detention hearing. She

claimed she did not remember their saying they did not know whether the Defendant would be charged because they did not know the facts, but she later admitted that this had been said. She said that although the waiver document listed times of 2:15 p.m. and 2:25 p.m., the times were not on the document when she signed it. She said she could not have gone to Indiana that day because there had been a snow storm.

Investigator Kendall Hargis testified that he, Sheriff Melton, and Mr. Gore went to Ms. Coffel's house around 8:30 a.m. on December 12, 2010, in order to determine the Defendant's whereabouts. He was certain Ms. Coffel wanted to know why they wanted to locate the Defendant. He thought they told her that it was urgent but not that it was related to a homicide. He said they relayed the information they obtained from Ms. Coffel to Indiana authorities.

Investigator Hargis testified that Agent Huntley requested he contact Ms. Coffel to obtain permission to interview the Defendant. He was unaware Ms. Coffel told other officers she did not want the Defendant interviewed. He called Ms. Coffel, who advised him that she had already spoken with Officer Emmons in Indiana and that she did not want the Defendant questioned without an attorney. He relayed the information to Agent Huntley but did not know if he told anyone else. He said it was "likely" he told Agent Huntley that Ms. Coffel had told other officers she did not want the Defendant questioned. He did not think he told anyone other than Agent Huntley about his conversation with Ms. Coffel, but he acknowledged it was possible he had. An audio recording of the telephone call was played.

Gregory Hutte testified that he lived with Ms. Coffel and was home on December 12, 2010. He said he was aware of the problems between Ms. Coffel and the Defendant. He said Ms. Coffel had been trying to visit the Defendant. He said that when Mr. Hargis, Mr. Gore, and Sheriff Melton visited on the morning of December 12, they would not answer his and Ms. Coffel's questions about why they were looking for the Defendant. He said that after they left, Ms. Coffel made telephone calls to the ISP, the Gas City Police, and "some other places" trying to obtain information about the Defendant. He said that based upon what he heard Ms. Coffel tell Gas City authorities, he was "shocked" the Defendant was questioned.

Mr. Hutte testified that when the State authorities brought the waiver for Ms. Coffel to sign permitting questioning of the Defendant, Ms. Coffel told them that she did not want the Defendant questioned without a lawyer or herself present. He said Mr. York advised them that if she did not sign the document, he would prosecute the Defendant to the fullest extent of the law and that the Defendant probably would never be released from prison. Mr. Hutte said that Mr. York stated the Defendant might someday be released if Ms. Coffel signed the document. He said that Ms. Coffel "went back and forth" and that he told her maybe she should sign it. He said he was scared. He said that she eventually signed it and

that she looked scared. Regarding the time the authorities were at the house, he thought it was later than 10:00 or 11:00 a.m. and said he "suppose[d]" the time of 2:00 or 2:15 p.m. shown on the document was accurate. He said Mr. York stated during the visit with him that the crime scene was the worst he had ever seen but was unsure if Mr. York said he was not yet aware of all the facts.

Mr. Hutte disagreed that the sheriff told them before the second visit from the authorities that a homicide had occurred. He later said he did not remember if the sheriff called and said a homicide had occurred and did not remember if Ms. Coffel said the sheriff had called and mentioned a homicide. He said he drove past the victim's house and saw crime scene tape. He said he told Ms. Coffel it looked "pretty bad."

After receiving the proof, the trial court made the following pertinent findings: The Defendant was in custody when the paramedics were present. She was questioned by Ms. Kinder for the purpose of rendering medical aid to a minor. Ms. Kinder was not an agent of the State when she asked the Defendant questions pertinent to rendering medical aid. Ms. Kinder had no prior knowledge of the case. Ms. Bailey overheard the Defendant's statements about the crime and was not a state agent. As soon as the paramedics understood that the Defendant was incriminating herself, they stopped her. The police officers present took appropriate action to ensure the Defendant was not questioned until she was advised of her rights. The Defendant was given a thorough *Miranda* warning before she signed the waiver and gave her recorded statement. When she said she had been "doing this all day," she was referring to giving her identifying information. The recording shows that Sergeant Collins did not overbear the Defendant's will. She was given the opportunity to state what she knew, and she wanted to do so. She said she was going to be truthful. She was able to explain the meaning of "coercion." The court concluded upon review of the totality of the circumstances, the State had proven by a preponderance of the evidence that the statement was voluntary. The court filed a written order that stated the Defendant's statement to the paramedics was admissible in its entirety, and the statement to the police officers before she asked for a lawyer was admissible.

### A. Statement to Paramedics

The Defendant contends, first, that the Defendant's statement to the paramedics should have been suppressed because it was the product of a custodial interrogation by a state actor using medical inquiries as a pretext for obtaining incriminating information. The Defendant also emphasizes her young age, lack of experience with the police, and multiple suicide attempts in the hours before she was taken into custody as factors to consider in our determination.

As we have noted, the Defendant was under arrest when she encountered the paramedics. Our supreme court has condemned the use of deceptive police practices after a defendant has been charged with a crime because they violate the Sixth Amendment right to counsel. *See State v. Berry*, 592 S.W.2d 553, 556-61 (Tenn. 1980) (holding that a homicide defendant's Sixth Amendment rights were violated when questioned by a law enforcement officer posing as a jail inmate); *see also State v. Henry Floyd Sanders*, — S.W.3d —, No. M2011-00962-SC-R11-CD, 2014 WL 5801665, at *14 n.12 (Tenn. Nov. 10, 2014) ("Once the right to counsel attaches to a defendant, law enforcement officers are not permitted 'to do by ruse, trickery, deceit and deception that which it is not permitted to do openly and honestly.'" (quoting *Berry*, 592 S.W.2d at 561)).

The trial court rejected the argument that the paramedics were state actors. No evidence shows that the police recruited the paramedics to obtain information from the Defendant. Ms. Kinder testified that she responded to a call about a possible overdose and that she did not know why the Defendant was at the police station. Ms. Bailey knew the Defendant was a suspect in a homicide investigation, but she did not think she told Ms. Kinder. The Defendant's admissions were not in response to interrogative questioning by Ms. Kinder. No evidence shows any attempt by the paramedics to elicit incriminating information. To the extent Ms. Kinder asked questions, they were focused on getting help for the victim before Ms. Kinder understood the victim was deceased. Ms. Bailey did not question the Defendant and was merely completing paperwork during part of the Defendant's encounter with Ms. Kinder. The paramedics terminated the encounter when the Defendant began incriminating herself.

The evidence does not preponderate against the trial court's finding that the paramedics were not state actors. The Defendant's statements to the paramedics were not a result of custodial interrogation by the police.

The Defendant also contends that the Defendant's inculpatory statements to Ms. Kinder should be suppressed pursuant to the psychiatrist/patient privilege. *See* T.C.A. § 24-1-207. She reasons that the privilege extends to a psychiatrist or a member of a psychiatrist's staff and that the Defendant's statements about having attempted suicide referred to mental or emotional problems, placing Ms. Kinder in the role of a psychiatric nurse. Therefore, the Defendant argues her statements were privileged and should have been suppressed. The Defendant has not cited any authority for the extension of the statutory psychiatrist/patient privilege to a patient's statements to emergency medical personnel. The State notes the lack of authority for the Defendant's argument and the lack of evidence that the paramedics in this case were communicating with the Defendant at the direction of a psychiatrist or as a member of a psychiatrist's staff. Because this issue was not raised in the written motion to suppress or at the suppression hearing, it is waived. *See State v. Leach*, 148

S.W.3d 42, 55 (Tenn. 2003) (stating that "[a]s a general rule, a party may not litigate an issue on one ground, abandon that ground post-trial, and assert a new basis or ground on appeal"); *see also* T.R.A.P. 36(a) ("[R]elief may not be granted in contravention of the province of the trier of fact.").

## B. Statement to Police Officers

The Defendant contends that the trial court erred in denying the motion to suppress her statement to Sergeant Collins and Deputy Hammel. She argues that her waiver of rights was not voluntary due to her age, state of mind, recent suicide attempts, lack of experience with law enforcement, and knowledge of a waiver her mother signed allowing the Defendant to be questioned that was itself a product of coercion.

"The test of voluntariness for confessions under Article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996); *see State v. Northern*, 262 S.W.3d 741, 763 (Tenn. 2008). To be considered voluntary, a statement must not be the product of "'any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.'" *State v. Smith*, 42 S.W.3d 101, 109 (Tenn. Crim. App. 2000) (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)). A defendant's subjective perception is insufficient to establish the existence of an involuntary confession. *Id.* The essential inquiry is "'whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined[.]'" *State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980) (quoting *Rogers v. Richmond*, 365 U.S. 534, 544 (1961)). A confession is involuntary if it is the product of coercive state action. *See, e.g., Colorado v. Connelly*, 479 U.S. 157, 163–64 (1986).

When the suspect is a juvenile, a waiver is analyzed using a totality of the circumstances approach that takes the following factors into account:

> (1) consideration of all circumstances surrounding the interrogation including the juvenile's age, experience, education, and intelligence;

> (2) the juvenile's capacity to understand the *Miranda* warnings and the consequences of the waiver;

> (3) the juvenile's familiarity with *Miranda* warnings or the ability to read and write in the language used to give the warnings;

(4) any intoxication;

(5) any mental disease, disorder, or retardation; and

(6) the presence of a parent, guardian, or interested adult.

*State v. Callahan*, 979 S.W.2d 577, 583 (Tenn. 1998). In addition, the Tennessee Rules of Juvenile Procedure provide:

> Intimidative or coercive methods shall never be used in questioning children. If feasible, a parent or guardian should be present during questioning. In any event, no child having been placed in and present in a detention facility shall be interrogated concerning an alleged violation of law unless the child intelligently waives in writing the right to remain silent.

Tenn. R. Juv. P. 7(d).

We will consider the validity of the Defendant's waiver in light of the *Callahan* factors. Regarding her age, experience, education, and intelligence, we note that the trial court found that the sixteen-year-old Defendant was intelligent and had life experience. She stated in the interview that she was in the tenth grade. She had been living independently from her mother. The court found that Ms. Coffel's concern for the Defendant's living independently was related to Ms. Coffel's loss of food stamp benefits, not the Defendant's living as an adult.

Regarding the Defendant's capacity to understand the *Miranda* warnings and the consequences of the waiver and her familiarity with the warnings, the trial court found that the Defendant was thoroughly advised of her *Miranda* rights. Her waiver of those rights was memorialized in the recording and by her signature on the written waiver. The Defendant stated that she was going to be truthful. She was able to explain the meaning of "coercion." The record does not reflect that the Defendant had any prior involvement with law enforcement, but the Defendant asked whether her mother was aware of what was happening, appeared to understand her rights when they were explained to her, and indicated her willingness to waive her rights. When she was questioned, she readily provided information in narrative form without extensive or accusatorial questioning. She appeared to understand what she was doing and wanted to relate the facts to the authorities.

Regarding intoxication, the record reflects that the Defendant stated she and Mr. Bowers had used drugs on previous occasions. They brought pills with them when they left Tennessee, but the pills were lost. She said that on the day she was taken into custody, she

and Mr. Bowers attempted suicide by injecting nicotine water and inhaling carbon monoxide. The record reflects, though, that she had been in custody for approximately eight hours before she gave her statement and that she was able to communicate without apparent impairment. Likewise, Ms. Kinder testified that the Defendant's vital signs were normal and that she had no medical problems warranting treatment earlier that day.

Regarding mental health concerns, the Defendant did not exhibit or report any problems. The recording shows that the Defendant was upset and cried frequently during the interview but that she was not so overcome by emotion that she had any difficulty relating the events of the crimes. The officers questioned her calmly. Although she reported multiple suicide attempts, several hours had passed, and she did not appear to be in acute distress. She expressed her desire to tell the truth about the crime and her remorse for its effects on the lives of herself, Mr. Bowers, and her unborn child.

Regarding the presence of a parent, the record reflects that Ms. Coffel initially told officers she did not want the Defendant to be questioned without herself or an attorney present, but she changed her mind after she received more information from the sheriff that a homicide had occurred, talked to the district attorney general and employees of his office, and made telephone calls. Although the Defendant argues that Ms. Coffel was threatened with the Defendant's receiving harsher punishment if Ms. Coffel did not sign the consent form, the evidence falls short of showing that Ms. Coffel was threatened or coerced into signing the form. We note, as well, that Ms. Coffel testified that she was unable to go to Indiana on December 12, 2010, due to inclement weather. The Defendant asked about her mother's knowledge of what was happening and was advised that her mother signed the consent form. The Defendant told Ms. Kinder that she did not want to give out Ms. Coffel's contact information because her mother did not care about her and was a drunk.

The record reflects that the trial court considered the relevant factors and concluded upon review of the totality of the circumstances that the State had proven by a preponderance of the evidence that the statement was voluntary. Upon review, we conclude that the evidence does not preponderate against the court's findings and that the findings support the court's conclusion. The Defendant is not entitled to relief on this basis.

**IV**

**Crime Scene Video Recording and Photograph**

The Defendant contends that the trial court erred by failing to suppress the video recording of the crime scene depicting the victim's body and a photograph taken during the victim's autopsy. She argues the recording and photograph were admitted in violation of

Tennessee Rule of Evidence 403. The State responds that the trial court properly admitted the evidence. We agree with the State.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

The admissibility of a crime scene video recording is "within the sound discretion of the trial judge, and [a] ruling on the admissibility of such evidence will not be overturned without a clear showing of abuse of discretion." *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993); *see State v. McCray*, 922 S.W.2d 511, 515 (Tenn. 1996). A trial court abuses its discretion when it applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006).

Photographs of victims "are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." *State v. Banks*, 564 S.W.2d 947, 950-51 (Tenn. 1978). When determining the admissibility of such evidence, the trial court should consider

> their accuracy and clarity, and whether they were taken before the corpse was moved, if the position and location of the body when found is material; the inadequacy of testimonial evidence in relating the facts to the jury; and the need for evidence to establish a prima facie case of guilt or to rebut the defendant's contentions.

*Id*. at 951.

The record reflects that before the trial, the Defendant moved to exclude the video recording of the crime scene. Trial counsel argued the recording showed the victim at the scene and was unnecessary given the testimony of the police officers and emergency personnel who were present at the scene. Counsel, though, did not object to the remaining portions of the recording and noted the holes in the walls showed Mr. Bowers's propensity for violence and were relevant to the defense.

The trial court found that the video recording was relevant because it permitted the jury to "be in touch with" the scene and to view firsthand where things were located and how

events unfolded. The court noted trial counsel's concession that the recording was relevant, in part, to Mr. Bowers's propensity for violence. The court found that the recording was not gruesome, although it showed the victim lying on the floor. The court found that the completeness of the police investigation was reflected in the recording and that the recording reflected what the officer saw. The court found that the recording was relevant and permitted the State to present it to the jury in its entirety.

Regarding admission of the video recording, we conclude that the trial court did not abuse its discretion. The recording is neither inflammatory nor gruesome, and it is extremely probative of the condition and appearance of the victim and the scene. Although the victim was deceased and lying on the floor, the recording corroborated, in part, the Defendant's statements regarding how the victim was killed and showed the placement of the pillow and dog cord used to kill the victim. The recording also showed the absence of the victim's car, the layout of the victim's house, and the placement of other pieces of evidence.

Relative to the photographs, the Defendant objected to various photographs of the victim, including photographs taken during the autopsy. Trial counsel argued the photographs of the victim were too graphic and prejudicial and would inflame the jury. The trial court excluded several photographs, and the only photograph relevant to this appeal is a closeup of the victim's face showing facial petechia indicative of asphyxiation. Counsel argued the medical examiner's testimony and the autopsy report sufficiently described the markings on the victim's face, which made the photograph unnecessary. The court found that although the photograph was of the victim's face, it was not particularly gruesome and that the photograph clearly showed markings. The court found that the State could present the photograph as long as it could lay the proper foundation with the medical examiner that the markings were indicative of asphyxiation.

Regarding the photograph of the victim's face, the record reflects that trial counsel objected to its admission on the ground of relevance. The medical examiner testified that the photograph showed petechia around the victim's eyes and an abrasion on her forehead. At that point, counsel withdrew his objection, and the photograph was admitted. Because counsel withdrew his objection to the photograph, the issue is waived. *See* T.R.A.P. 36(a); *see also* Tenn. R. Evid. 103(a)(2). In any event, we note that nothing in the record warrants a conclusion that the trial court committed plain error by admitting the photograph. *See State v. Adkisson*, 899 S.W.2d 626 (Tenn. Crim. App. 1994); *see also State v. Smith*, 24 S.W.3d 274 (Tenn. 2000). The Defendant is not entitled to relief on this basis.

# V

## Victim's Fear of Mr. Bowers

The Defendant contends that the trial court erred by failing to admit evidence of the victim's fear of Mr. Bowers. She argues witness testimony relative to the victim's fear was admissible because it qualified as a state of mind exception to the rule against hearsay. The State responds that the trial court properly excluded the relevant testimony because the state of mind exception only applies to material issues. We agree with the State.

Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is inadmissible unless it qualifies as an exception. *Id.* at 802. Tennessee Rule of Evidence 803(3) provides:

Hearsay Exceptions. – The following are not excluded by the hearsay rule:

. . . .

(3) Then Existing Mental, Emotional, or Physical Condition. – A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Trial counsel attempted to present evidence that the victim feared Mr. Bowers and that Mr. Bowers "could have been responsible" for the offenses. During Ms. Breeding's cross-examination, she stated that she and the victim had talked about Mr. Bowers. When counsel asked if the victim told Ms. Breeding that she feared Mr. Bowers, the prosecutor objected on the basis of hearsay. Counsel argued the statement would qualify as the existing emotional state of fear and was admissible as a hearsay exception. The trial court sustained the objection. Upon further questioning, Ms. Breeding testified that she spoke to the victim several times per week and that they were close. Ms. Breeding stated that the victim spoke to her when the victim was upset about Mr. Bowers. When counsel asked about the substance of those conversations, the court sustained the prosecutor's hearsay objection. Ms. Breeding further testified that the victim was usually upset but did not usually cry when they discussed Mr. Bowers. When asked if the victim told her that Mr. Bowers previously assaulted her, the court sustained the prosecutor's hearsay objection.

-42-

Although the Defendant contends the elicited testimony was not hearsay and cites to the applicable rule of evidence, she fails to present this court with legal authority supporting her contention and fails to explain how the testimony qualified as an existing mental or emotional condition. *See* T.R.A.P. 27(a)(7)(A) (stating that the appellant's brief must contain an argument providing "the contentions . . . with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record); *see also* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). In any event, the Defendant states that the purpose of the testimony was to show that Mr. Bowers "could have been responsible" for the offenses. The State presented ample evidence of Mr. Bowers's participation in the killing. The Defendant's statements to the police identified Mr. Bowers's role in the offenses, and Mr. Bowers admitted to strangling the victim. The defense presented evidence through Mr. Savage and Sheriff Melton about the victim's being upset regarding Mr. Bowers and the victim's receiving advice to contact the sheriff's office and to throw Mr. Bowers out of her house. Likewise, Mr. Breeding testified that Mr. Bowers previously shoved the victim, and Mr. Bowers admitted in his statement to the police that he previously stole the victim's money. The jury was free to find implicitly based on this evidence that the victim was concerned about Mr. Bowers's behavior toward her. The Defendant is not entitled to relief on this basis.

## VI

## Witness Testimony

The Defendant contends that the trial court erred in excluding evidence of the circumstances of Ms. Coffel's consent for the authorities to question the Defendant. She contends that the evidence was relevant and admissible after the State was allowed to introduce her statement, in which Sergeant Collins stated that a Tennessee district attorney general met with Ms. Coffel and reviewed the consent form and that Ms. Coffel signed it. She argues that the police "very clearly informed the Defendant that her mother had given her permission for them to talk to the Defendant" and that "the statement of the officer was included in an attempt to somehow bootstrap the statement of the Defendant and convince the jury to give it more weight than it deserved." The State contends that the Defendant waived the issue by failing to cite to relevant portions of the record. *See* T.R.A.P. 27(a)(7)(A); Tenn. Ct. Crim. App. R. 10(b). In her reply brief, the Defendant provided the missing citation to the record. We will consider the issue on the merits.

At trial, the Defendant sought to introduce the testimony of Ms. Coffel, Mr. Hutte, and Mr. Hargis regarding the circumstances of Ms. Coffel's signing the consent form. The Defendant relied on the testimony of these witnesses at the suppression hearing as her offer of proof. In advocating for the admission of the evidence, trial counsel argued that the State "opened the door" by offering the evidence. Counsel explained, "We don't want the jury to somehow think well, the mother said it was okay, so everything must have been all right." The trial court accepted the offer of proof but denied relief.

We fail to see the relevance of the circumstances of the State's obtaining the Defendant's mother's consent to any fact of consequence in the case. The recorded statement established the voluntariness of the Defendant's waiver of her *Miranda* rights and her role in the murder. The statement also established that the Defendant and her mother were estranged and that the Defendant did not regard her mother as having her best interests at heart. We cannot conclude from the recording that Sergeant Collins's statement to the Defendant that he had obtained Ms. Coffel's consent for the interview was a meaningful factor in the Defendant's decisions to waive her rights and to give a statement. The Defendant has not explained how Ms. Coffel's consent for the interview might have caused the jury to confer greater weight on the Defendant's statement, nor is any such concern apparent upon our review of the record. The evidence is not relevant. *See* Tenn. R. Evid. 401. We note, as well, that the evidence had the potential to confuse the issues and mislead the jury about the significant issues in the case. *See* Tenn. R. Evid. 403. The Defendant has failed to establish that the trial court abused its discretion in excluding the evidence. She is not entitled to relief on this basis.

## VII

## Intoxication Jury Instruction

The Defendant contends that the trial court erred by failing to provide an intoxication jury instruction. She argues the trial court erroneously found that no evidence was presented regarding the Defendant's intoxication on the day of the offenses and the effects of the drugs she took. The State responds that the trial court properly denied the Defendant's request for an intoxication instruction. We agree with the State.

A criminal defendant has "a right to a correct and complete charge of the law." *Hanson*, 279 S.W.3d at 280 (citing *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000)). As a result, a trial court has a duty "to give proper jury instructions as to the law governing the issues raised by the nature of the proceeding and the evidence introduced at trial." *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013) (citing *Dorantes*, 331 S.W.3d at 390); *see State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975). A jury instruction related to general

defenses is not required to be submitted to the jury "unless it is fairly raised by the proof." T.C.A. § 39-11-203(c) (2014). An erroneous jury instruction, though, may deprive the defendant of the constitutional right to a jury trial. *See Garrison*, 40 S.W.3d at 433-34.

Our supreme court has concluded that sufficient evidence to fairly raise a general defense "is less than that required to establish a proposition by a preponderance of the evidence." *Hawkins*, 406 S.W.3d at 129. A trial court's determination in this regard "must consider the evidence in the light most favorable to the defendant and draw all reasonable inferences in the defendant's favor." *Id*.; *see State v. Sims*, 45 S.W.3d 1, 9 (Tenn. 2001); *Johnson v. State*, 531 S.W.2d 558, 559 (Tenn. 1975); *State v. Bult*, 989 S.W.2d 730, 733 (Tenn. Crim. App. 1998); *see also State v. Shropshire*, 874 S.W.2d 634, 639 (Tenn. Crim. App. 1993). If evidence has been presented which reasonable minds could accept as a defense, "the accused is entitled to appropriate instructions." *Johnson*, 531 S.W.2d at 559. A jury instruction is "prejudicially erroneous only if the . . . charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005).

"[I]ntoxication itself is not a defense to prosecution for an offense. However, intoxication, whether voluntary or involuntary, is admissible in evidence, if it is relevant to negate a culpable mental state." T.C.A. § 39-11-503(a) (2014). Voluntary intoxication is defined as "intoxication caused by a substance that the person knowingly introduced into the person's body, the tendency of which to cause intoxication was known or ought to have been known." *Id.* § 39-11-503(d)(3) (2014). This court has stated that

> proof of intoxication alone is not a defense to a charge of committing a specific intent crime nor does it entitle an accused to jury instructions . . . ; there must be evidence that the intoxication deprived the accused of the mental capacity to form specific intent. An intoxicated person might have . . . intent while a sober person might not.

*Harrell v. State*, 593 S.W.2d 664, 672 (Tenn. Crim. App. 1979). The key inquiry "is not whether the accused was intoxicated, but what was [the person's] mental capacity." *Id.*

The record reflects that the Defendant admitted during her police interview that she and Mr. Bowers became depressed and ingested Dilaudid after her mother threatened to have Mr. Bowers arrested for statutory rape. However, no evidence shows the amount she consumed or that she was intoxicated to the extent it deprived her of the ability to form the required intent to commit the offenses. The Defendant never stated in her police interview that she was under the influence of the Dilaudid at the time of the killing, and she never stated that she did not understand what was happening or what she was doing. The

Defendant told the police that her mother called around 10:30 a.m. on the day of the killing and that she and Mr. Bowers started getting high afterward. She reported that they began to discuss killing the victim around 2:00 p.m. and that the victim arrived home around 5:30 p.m. The Defendant was articulate during the police interview and clearly remembered the sequence of events leading up to the killing. We note that although Dr. Walker testified that Dilaudid caused "gross intoxication in most people," no evidence was presented that the Defendant was intoxicated by Dilaudid at the time of the killing. In fact, Dr. Walker only testified that the Defendant's ability to think and to make good decisions might have been impaired. We cannot conclude that the trial court erred by refusing to provide an intoxication jury instruction. The Defendant is not entitled to relief on this basis.

## VIII

### Duress Jury Instruction

The Defendant contends that the trial court erred by failing to provide a duress jury instruction. She argues that evidence regarding the Defendant's being threatened and in an abusive relationship with Mr. Bowers supported the instruction. The State responds that the trial court properly denied the Defendant's request for a duress instruction. We agree with the State.

Tennessee Code Annotated section 39-11-504(a) (2014) states, in relevant part, that duress can be a defense

> where the person . . . is threatened with harm that is present, imminent, impending, and of such a nature to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. The threatened harm must be continuous throughout the time the act is being committed, and must be one from which the person cannot withdraw in safety. Further, the desirability and urgency of avoiding the harm must clearly outweigh the harm sought to be prevented by the law proscribing the conduct, according to ordinary standards of reasonableness.

The trial court noted the proof that the Defendant told witnesses that after the killing, Mr. Bowers took her to a bridge and threatened to throw her in the water. The court found that even if true, any threat of harm arose after the killing, not before or during the killing. The court, likewise, found that no evidence showed that the Defendant had a well-grounded apprehension of death or serious bodily injury if "the act was not done." The court found no evidence showed that Mr. Bowers threatened to kill the Defendant or to inflict serious bodily

injury upon her if she did not participate in the killing. The record supports the court's findings.

The record reflects that the Defendant described an abusive relationship with Mr. Bowers to Drs. Walker and Phillips. Although the Defendant never mentioned to the police any alleged abuse or threats made by Mr. Bowers, she told Drs. Walker and Phillips that after the killing, they drove to Standing Stone, where they stopped at a bridge. According to the Defendant, Mr. Bowers grabbed her hair, shoved her face over the bridge wall, and threatened to kill her by throwing her in the water if she refused to do what he wanted. She claimed she feared for her life. Although their relationship might have been abusive and Mr. Bowers might have threatened to kill the Defendant while standing on the bridge, no evidence was presented that Mr. Bowers was going to kill or to seriously injure the Defendant if she did not participate in the killing. To the contrary, the evidence shows that the Defendant and Mr. Bowers planned the killing together and that the Defendant suggested the manner in which they would kill the victim. The video recordings from the convenience and grocery stores after the killing also fail to show that the Defendant was acting under duress. She is not entitled to relief on this basis.

## XI

## Cruel and Unusual Punishment

The Defendant contends that the mandatory life sentence imposed for first degree murder violates the federal and Tennessee constitutional prohibitions against cruel and unusual punishment. She argues that her sentence is in effect a life sentence without the possibility of parole and that such sentences are unconstitutional for juvenile offenders. The State responds that the sentence is not cruel and unusual punishment. We agree with the State.

Immediately after the trial, the trial court imposed a sentence of life imprisonment as required by law. At the sentencing hearing, the parties agreed to concurrent sentences of fifteen years for conspiracy to commit murder, fifteen years for especially aggravated robbery, and two years for theft. The court permitted testimony regarding the presentence report and the victim impact statements. Trial counsel, however, noted that although the Defendant was not contesting the State's request for the minimum sentences, she was not waiving the right to raise on appeal whether a life sentence was unconstitutional as cruel and unusual punishment for a juvenile offender.

The Eighth Amendment to the United States Constitution and article I, section 16 of the Tennessee Constitution state, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII; Tenn. Const. art. 1, § 16. In recent years, the Supreme Court has specifically addressed sentencing juvenile offenders after being convicted in criminal court. In *Graham v. Florida*, 560 U.S. 48 (2010), a sixteen-year-old defendant was convicted of armed burglary and attempted armed robbery and was ultimately sentenced to life imprisonment for armed burglary and to fifteen years for attempted robbery. Florida no longer provided parole, giving the defendant no opportunity for release, except executive clemency. The Court concluded that in nonhomicide cases, the State is not required to guarantee release to a juvenile offender but must give such an offender "[a] meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. . . . [W]hile the Eighth Amendment forbids a State from imposing . . . life without parole . . . on a juvenile nonhomicide offender, it does not require the State to release that offender during his natural life." *Id.* at 74. The Court noted that "[t]he Eighth Amendment does not foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life." *Id.*

In *State v. Tavaria Merritt*, No. M2012-00829-CCA-R3-CD, 2013 WL 6505145 (Tenn. Crim. App. Dec. 10, 2013), *no app. filed*, this court was charged with determining whether an effective 225-year sentence to be served at 100% for nonhomicide offenses was the equivalent of a life sentence without the possibility of parole and whether a such sentence for a juvenile offender was in violation of *Graham* and our prohibition against cruel and unusual punishment. This court concluded that although the effective sentence was the equivalent of life imprisonment, "the sentence did not violate *Graham*'s specific holding because [the defendant] was not sentenced to life imprisonment without the possibility of parole." *Tavaria Merritt*, 2013 WL 6505145, at *6. The court concluded that "*Graham* applie[d] only to juveniles sentenced to life imprisonment without the possibility of parole for nonhomicide offenses[.]" *Id.*

More recently, the Supreme Court extended its rationale in *Graham* to juvenile offenders convicted of homicides. In *Miller v. Alabama*, — U.S. —, —, 132 S. Ct. 2455, 2464 (2012), the Court concluded that mandatory life imprisonment without the possibility of parole for juvenile offenders generally violates the prohibition against cruel and unusual punishment. There, the juvenile defendants were convicted of murder after being transferred to adult court and sentenced to life imprisonment without the possibility of parole as required by state statute. The Court reasoned that mandatory life imprisonment without the possibility of parole prevented trial judges from considering in sentencing the juvenile's age, immaturity, impetuosity, and failure to appreciate risks and consequences, the family and home environment, and the circumstances of the homicide, including the extent of the juvenile's participation. *Id.* at 2468. As a result, the Court concluded that juvenile offenders

-48-

cannot be sentenced to life imprisonment without the possibility of parole in homicide cases. *Id.* at 2464.

Based on the Supreme Court's reasoning in *Graham* and *Miller*, the Defendant now asks this court to conclude that her life sentence is unconstitutional. We decline to make such a conclusion. Pursuant to our statutes, life imprisonment permits release eligibility after serving fifty-one years. *See* T.C.A. § 40-35-501(h)(1), (i)(1), (i)(2)(a) (2010) (amended 2012, 2013, 2014). Although the Defendant was a juvenile at the time of the murder, she was given a sentence that provides for release eligibility. Therefore, *Graham* and *Miller* do not apply.

Recently, this court has refused to extend *Miller* to juvenile offenders convicted of murder who receive life imprisonment with the possibility of parole. In *Floyd Lee Perry, Jr. v. State*, No. W2013-00901-CCA-R3-PC, 2014 WL 1377579, at *5 (Tenn. Crim. App. Apr. 7, 2014), *no app. filed*, this court concluded that *Miller* does not apply to juvenile defendants who are sentenced to life imprisonment carrying the possibility of release or parole after serving fifty-one years in confinement. The court stated, "While the next logical step may be to extend protection to these types of sentences, that is not the precedent which now exists." *Id*. The court stated that it was "not compelled to grant the . . . request to expand the meaning of the *Miller* holding." *Id*.; *see Charles Damien Darden v. State*, No. M2013-01328-CCA-R3-PC, 2014 WL 992097, at *11 (Tenn. Crim. App. Mar. 13, 2014) (distinguishing Tennessee's life imprisonment sentence from the Arkansas and Alabama sentencing statutes at issue in *Miller*, which provided for mandatory life sentences without the possibility of parole for juvenile offenders convicted of murder), *no app. filed*. As a result, the Defendant is not entitled to relief on this basis.

# X

## Transfer from Juvenile Court

The Defendant contends that the juvenile court erred by transferring her case to criminal court. She argues the juvenile court erroneously relied on her statement to the police because it was obtained illegally without her mother's effective consent. The State responds that the juvenile court properly transferred the case to criminal court. We agree with the State.

At the transfer hearing, Patricia Bilbrey, the victim's daughter, testified that the victim was age seventy-two and had seven children. Mr. Bowers was her nephew and lived with the victim. She met the Defendant in November 2010, when the Defendant began living with Mr. Bowers at the victim's house. She last saw the Defendant at the victim's house after

Thanksgiving and said it was a normal day. She said that frequently the Defendant and Mr. Bowers stayed in their bedroom. Although she and the Defendant spoke, she learned from the victim that the Defendant was sixteen years old.

Overton County Sheriff's Detective Steven Ritz testified that he and Detective Greg Cooper responded to the victim's house on the night of the killing. They found the victim lying on her back on the floor with a red cord around her neck. He saw a pillow lying beside the victim. He identified a photograph of the victim taken by TBI Special Agent Steve Huntley. The victim's house was searched after a warrant was obtained. He learned the victim's gray Toyota Scion was missing.

Detective Ritz identified a photograph of a portion of the red cord found in the Defendant and Mr. Bowers's bedroom near the closet. Wire cutters were found in the same bedroom, and Detective Ritz considered them evidence because the cord found around the victim's neck had been cut. He identified the autopsy report and agreed the cause of death was asphyxia due to strangulation and to smothering. He agreed the Defendant underwent a mental health evaluation performed by Dr. Sandra Phillips at Volunteer Behavioral Health.

On cross-examination, Detective Ritz testified that he received the dispatch call around 9:00 p.m. and arrived at the scene twenty to thirty minutes later. He said that he entered the house during the investigation, along with Detective Cooper. They waited about two hours for the search warrant. Detective Ritz stated that he collected the cord, wire cutters, pillow, pillowcase, and clothes as evidence, although he did not know if any examinations were performed on the items. He said two TBI agents entered the house after the warrant was obtained.

Ashley Ogletree testified that she was the store manager at the Raceway convenience store in Livingston and that on December 10, 2010, she worked from 2:00 p.m. to 10:00 p.m. The Defendant entered the store around 8:00 or 8:30 p.m. with a man, whom she did not know personally but recognized. The man walked to the restroom, and the Defendant approached a group of men talking inside the store. The Defendant asked if the men knew how to get to Indiana, and they denied knowing directions. The Defendant paid for the gas they pumped and asked to look at a map. Ms. Ogletree directed the Defendant to the maps and provided her with pen and paper. She recalled that the Defendant and the man were traveling in a silver hatchback and that the Defendant mentioned she was about five-months pregnant and was going to name the child Maverick. She said the Defendant acted normal, although she appeared to be "high strung." The Defendant said she was excited because she was going to visit family. The Defendant was inside the store for five to ten minutes, and Ms. Ogletree said the security surveillance camera recorded the Defendant inside the store.

ISP Detective Matt Collins testified that on December 12, 2010, he was contacted by Tennessee law enforcement, who asked him to help find the victim's missing vehicle. He was told that the car was connected to a homicide and that Mr. Bowers and the Defendant might have been traveling in the victim's car. He found the victim's car at the Defendant's grandparents' house in Gas City, Indiana. The Defendant and Mr. Bowers were taken into custody because Detective Collins received a Tennessee warrant for Mr. Bowers's arrest for theft and a Tennessee juvenile petition for the Defendant.

Detective Collins testified that he interviewed the Defendant at the juvenile detention center and that Deputy Chad Hammel was present. The interview occurred in a large visitation room with a conference table and chairs. The room also had a desk and office partition, which is where the interview occurred. The door to the visitation room was closed but unlocked. The female "confinement" officer who escorted the Defendant into the room was present during the interview but out of the camera's view. Detective Collins received a consent form signed by the Defendant's mother giving him permission to question the Defendant. He told the Defendant about her mother's consent and allowed her to review the form. The Defendant was advised of her *Miranda* rights, and the Defendant stated that she did not need an attorney because she was going to tell the truth. Detective Collins testified regarding the substance of the Defendant's statement, which was consistent with the recording played at the trial and at the suppression hearing.

Detective Collins testified that Indiana law required him to attempt to obtain consent from the parents of a juvenile suspect. When Tennessee law enforcement mentioned Detective Collins's interviewing the Defendant, he mentioned that a parent might need to be present for the purpose of a "meaningful consultation." He described meaningful consultation as a process during which the parent and the juvenile were told why the police wanted to speak with the juvenile and were advised of their rights. Afterward, the officer left the room and provided the parent and the juvenile with an opportunity to consult about how to proceed. Detective Collins consulted his supervisor and the district attorney's office. Tennessee law enforcement researched the issue and told Detective Collins to interview the Defendant after receiving the signed consent form from the Defendant's mother.

On cross-examination, Detective Collins testified that at the time of the Defendant's interview, Indiana law required an interview to be audio or video recorded, but not both. He said the juvenile detention center was not equipped for audio/video recordings. He recorded the interview with a hand-held digital recorder. He said that the Defendant was detained at 11:00 a.m. and that the interview began at 7:15 p.m. The Defendant remained at the police station until the juvenile petition was received and was taken to the juvenile detention facility. He did not know if the Defendant had been provided food or drink or had been

permitted to use the restroom during that time. She was handcuffed during the interview. The Defendant did not appear sleepy or tired but was upset.

Overton County Youth Services Officer Shannon Wilson testified that she was a liaison with the juvenile court and the community on juvenile-related matters. She was asked to determine if she could find a place for the Defendant to be detained until her first court hearing. She investigated and learned that the Defendant had never been arrested before the killing, and as a result, the Defendant could not be placed in state custody or foster care. She did not know of any institutions in the county or the state in which the Defendant could be rehabilitated.

Kimberly Coffel, the Defendant's mother, testified regarding the circumstances surrounding her signing the consent form. She said that District Attorney General York and an assistant district attorney general came to her house. She said she called the Indiana police department where the Defendant was being detained and told the officers not to question the Defendant until she and an attorney were present. She said she also called the Grant County Juvenile Detention Center and provided the same instructions. She said Mr. York would not provide much information about what was happening, although he told her that the Defendant was wanted for questioning related to a vehicle theft. She said that the consent form she signed was regarding the vehicle theft and that Mr. York never mentioned the killing. She learned about the homicide when Sheriff Melton called her house.

Ms. Coffel testified that Mr. York told her it was in everyone's best interests for her to sign the consent form and that he would try the Defendant as an adult and to the fullest extent of the law if she did not sign the form. She did not recall reading the consent form but said she was sure she read it. She did not recall anyone telling her that the Defendant had the right to a detention hearing where a decision would be made regarding the Defendant's pretrial confinement. She said that nobody offered her an opportunity to speak with the Defendant and that nobody told her that she could be present via telephone during the police interview. She said she was intimidated by Mr. York and did not understand how her daughter was involved in the worst crime he had ever seen.

On cross-examination, Ms. Coffel testified that the Defendant and Mr. Bowers were dating and that they were living about one to one and one-half miles from her house. She learned on November 12, 2010, that the Defendant and Mr. Bowers were living with the victim. She said she attempted to be patient with the Defendant and said she was going to "giv[e] it one month." She said that before November 12, she called "them" three times for assistance in getting the Defendant home without involving the authorities but that nobody helped.

Ms. Coffel testified that she thought Mr. Bowers was about eighteen years old. She said Greg Hutte, her boyfriend, was home when Mr. York, the assistant district attorney, and police officers came to her house on December 12. She said that after they left, she learned the Defendant was involved in a homicide. She requested Mr. Hutte drive by the victim's house to determine what was happening, and Mr. Hutte told her the crime scene unit was at the victim's house.

On redirect examination, Ms. Coffel testified that Mr. York did not talk about her parental rights. She denied he advised that she had the right to visit the Defendant, that specific visiting hours applied, that corporal punishment was not administered in juvenile detention, that intimidating and coercive methods would not be used during the Defendant's interview, and that unauthorized persons would not be permitted to question the Defendant.

Relative to whether the Defendant's statement was admissible at the transfer hearing, the juvenile court found that proper procedures were followed in obtaining parental consent for the Defendant's interview. The court did not find that there was sufficient intimidation or coercion to make the Defendant's statement inadmissible or ineffective. The court found that valid parental consent was provided. Likewise, the court found that based on Detective Collins's testimony, the conditions of the surroundings in which the interview occurred did not render the statement coerced. The court found that the statement was voluntary and freely given.

Relying on Tennessee Code Annotated section 37-1-134 and Juvenile Procedure Rule 24, the juvenile court found that the transfer motion was filed by the State on January 5, 2011, and that the Defendant and trial counsel were provided adequate notice of the State's intention to transfer the Defendant to criminal court. The court noted that the Defendant, her mother, and her counsel were present at the hearing. The court, likewise, found that the Defendant's statement and the manner in which it was obtained satisfied the statute. The court found that sufficient evidence existed to corroborate the Defendant's statement.

The juvenile court found that the Defendant was age sixteen and that the State's witnesses were credible. The court stated that it assumed Ms. Coffel's testimony was presented to rebut the admissibility of the Defendant's statement. It stated that although a credibility finding relative to Ms. Coffel was probably unnecessary, it found Ms. Coffel credible except to the extent that she claimed she was intimidated into providing her consent.

Relative to the factors the juvenile court was required to consider in determining whether reasonable grounds existed to transfer the Defendant to criminal court, the court found that the Defendant had no previous delinquency records based on Ms. Wilson's testimony. It found that no proof was presented regarding past rehabilitation efforts. The

court found that the Defendant was accused of committing an offense against a person and that it did not know of any offense worse than the one alleged by the State. The court found the evidence sufficient to show that the offenses were committed in an aggressive and premeditated manner and that reasonable grounds existed to show that the Defendant committed the offenses. The court credited Ms. Wilson's testimony that insufficient rehabilitation services or facilities existed to serve the Defendant. The court found that the Defendant was not committable to an institution for the developmentally disabled or mentally ill based on Dr. Phillips's evaluation. Last, the court found that the interest of the community required the Defendant to continue to be under legal restraint and discipline. The Defendant was transferred to criminal court.

Once a juvenile petition has been filed alleging delinquent acts on the part of the child that are designated a crime, a court may transfer the child "to be dealt with as an adult" if:

> (1) The child was sixteen (16) years or more at the time of the alleged conduct[;]
>
> (2) A hearing on whether the transfer should be made is held in conformity with §§ 37-1-124, 37-1-126 and 37-1-127;
>
> (3) Reasonable notice in writing of the time, place and purpose of the hearing is given to the child and the child's parents . . . at least three (3) days prior to the hearing; and
>
> (4) The court finds that there are reasonable grounds to believe that:
>
> > (A) The child committed the delinquent act as alleged;
> >
> > (B) The child is not committable to an institution for the developmentally disabled or mentally ill;
> > (C) The interests of the community require that the child be put under legal restraint or discipline.

T.C.A. § 37-1-134(a)(1)-(4) (2014). A juvenile court must consider in making its determination the extent and nature of previous delinquency records, the nature of past treatment efforts, whether the alleged offense was against property or a person, whether the alleged offense was premeditated and aggressive, whether the child might be rehabilitated with services and facilities, and whether the conduct qualified as a criminal gang offense. *Id*. § 37-1-134(b)(1)-(6) (2014). We note that greater weight in favor of transfer is given when the alleged offense is against a person. *Id*. § 37-1-134(b)(3). A juvenile court's

findings in determining whether reasonable grounds exist to establish the criteria in subsection (a)(4) are reviewed for an abuse of discretion. *Howard Jefferson Atkins v. State*, No. W2006-02221-CCA-R3-PC, 2008 WL 4071833, at *7 (Tenn. Crim. App. Aug. 29, 2008); *see Howell v. State*, 185 S.W.3d 319, 329 (Tenn. 2006); *see also State v. Mario A. Reed*, No. M2009-00887-CCA-R3-CD, 2010 WL 3432663, at *6 (Tenn. Crim. App. Aug. 31, 2010).

The record reflects that the Defendant was sixteen years old at the time of the offenses, that a hearing was held in conformity with the appropriate legal authority, and that reasonable notice of the hearing was given to the Defendant and her mother. *See* T.C.A. § 37-1-134(a)(1)-(3). Likewise, the record shows that reasonable grounds existed to believe the Defendant committed the offenses, that the Defendant was not committable to an institution for the developmentally disabled or mental ill, and that the interests of the community required the Defendant be placed under legal restraint or discipline. *See id.* § 37-1-134(a)(4)(A)-(C).

Although the Defendant argues the juvenile court should not have relied on her police statement in transferring her case to criminal court, we have previously concluded that the Defendant's statement was admissible and that the trial court did not err by denying her motion to suppress. The juvenile court credited the State's witnesses and discredited Ms. Coffel's testimony that she was intimidated and coerced into providing her consent for the police to question the Defendant. The Defendant's confession and the additional evidence presented at the hearing provided the juvenile court with sufficient evidence to conclude that reasonable grounds existed to believe the Defendant committed the offenses of which she was accused. We conclude that the juvenile court did not abuse its discretion by transferring the Defendant's case to criminal court. She is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE